1999 UT 45

STATE of Utah, Plaintiff and Appellee,

v.

Bojidar Georgiev BAKALOV, Defendant and Appellant.

No. 940523.

Supreme Court of Utah.

May 11, 1999.

Rehearing Denied June 16, 1999.

STEWART, Justice.

¶1 Defendant Bojidar Georgiev Bakalov appeals his conviction of rape, a first degree felony. Bakalov was convicted on August 9, 1991, in a bench trial. He was represented by court-appointed counsel. That conviction was set aside because he had been denied his constitutional right to present his own defense. *See State v. Bakalov,* 849 P.2d 629, 637 (Ct.App.), *cert. granted and remanded,* 862 P.2d 1354, 1355 (Utah) (per curiam), *enforced,* 864 P.2d 1370 (Ct.App.1993) (per curiam) (remanding to trial court). On retrial, Bakalov represented himself and was convicted by a jury on September 29, 1994. Bakalov now appeals that conviction. We affirm, but remand for resentencing consistent with this opinion.

## I. BACKGROUND

¶2 Bakalov is a thoracic surgeon who came to Utah from Bulgaria to complete a fellowship at the University of Utah. Lauren J. worked as a secretary for The Church of Jesus Christ of Latter-day Saints (the LDS or Mormon Church) and served as an LDS stake missionary. Bakalov met Lauren around the first of April, 1991, through Lauren's roommate and fellow stake missionary, Deanna Ludlow, who had volunteered Lauren to type for Bakalov. Hoping to convert Bakalov to Mormonism, Lauren agreed to type for Bakalov for free.

¶3 During the next week, Bakalov went to Lauren's apartment several times for typing sessions. Lauren liked Bakalov and found him interesting, a "man's man." She was impressed by his professional accomplishments and appears to have been romantically interested in him as well. On Saturday, April 6, Bakalov went to Lauren's apartment in the late afternoon, and when Deanna and others left the apartment, Bakalov kissed Lauren on the neck and made other advances to her that she rejected. Soon thereafter, Lauren took Bakalov next door to introduce

Jan Graham, Att'y Gen., Christine Soltis, Asst. Att'y Gen., James M. Cope, Salt Lake City, for plaintiff.

Bojidar Georgiev Bakalov, pro se.*

---

* *Defendant Bakalov requested that Joan C. Watt and Vernice S. Ah Ching be removed as his stand-by counsel. The Court requested that they present arguments for Bakalov's position by submitting formal briefs. On January 23, 1998, after submission of the case to the Court for decision, Edward R. Montgomery filed an appearance as counsel for defendant. On May 5, 1998, the Court entered an order allowing Joan C. Watt and Vernice Ah Ching of the Salt Lake Legal Defender's Association to withdraw as stand-by counsel and allowing Edward R. Montgomery to appear as stand-by counsel for defendant.*

him to her Russian neighbors, and she waited for about an hour while Bakalov and the neighbors conversed in Russian.

¶ 4 When they left the neighbors' apartment, Bakalov suggested a drive in his truck. Lauren agreed because she was interested in seeing the medical dictionary on Bakalov's office computer. They did not stop at Bakalov's office, however, but drove to a secluded spot near the university. Bakalov again tried to kiss Lauren, but Lauren again refused. She wedged herself under the dash on the floor of the truck's cab, and when Bakalov persisted, she left the truck and started walking away. Bakalov pursued her, picked her up, and, despite her struggles, carried her back to the truck's open tailgate.

¶ 5 Lauren crawled inside the truck's camper shell, and Bakalov followed. He removed both of their shoes and tried to kiss her. Lauren braced herself, asked Bakalov repeatedly to stop, and pleaded that he not rape her. He removed Lauren's clothing, including her religious garments, which he mocked, fondled her, and then raped her. As he did so, Lauren prayed out loud for him to stop. She felt disoriented. Lauren dressed and returned to the truck's cab. Bakalov demanded that she talk, and in a rambling monologue, she related a string of violent images. When they returned to her apartment, Deanna thought Bakalov and Lauren sounded as though they were in a "light and laughing mood." Lauren packed Bakalov's things while he told Deanna that Lauren had been teaching him how to pray.

¶ 6 The next morning, as previously planned, Lauren went to an LDS Church general conference with friends. Her friends had invited Bakalov and his mother to join them, and at their urging, Lauren called Bakalov to see if his mother still planned to go. Bakalov declined. When he asked if he could see her again, Lauren said no and hung up the telephone. Bakalov went to Lauren's apartment that night and, after a discussion, offered Lauren birth control medicine which she refused. Lauren then told Deanna, and later her church bishop, of her rape. On Tuesday, April 9, nearly 72 hours after the incident, she reported the rape to the police and was given a "Code R" or rape medical examination. Semen containing intact sperm was found in her vagina. Seminal fluid stains were also found in the crotch of her garments and on her skirt.

¶ 7 When Bakalov was first questioned regarding the rape by Detective Allen, Bakalov evinced a willingness to discuss the alleged rape. Detective Allen terminated the interview because he could not understand Bakalov's English. Bakalov then contacted attorney Edward K. Brass whom he knew from their weight lifting together at a local gym. Brass advised Bakalov against speaking with the police and then called Detective Allen to instruct him not to talk to Bakalov. When police came to arrest Bakalov, he fled and hid in his apartment for thirty minutes. Brass represented Bakalov only briefly. Both Detective Allen and attorney Brass were called by the State to testify in the second trial—Brass to describe Bakalov's physical strength and Allen to recount the events surrounding Bakalov's arrest. In his testimony, Allen mentioned his telephone call from Brass.

¶ 8 Lauren initially reported that Bakalov had raped her only once. After a nightmare a few days later, however, Lauren remembered that a second incident of intercourse had occurred in succession to the first. She also recovered a memory regarding duct tape. At trial, Bakalov first denied any intercourse with Lauren but then later alleged that they had had consensual intercourse several times during the week preceding April 6. He claims that on the night of the alleged rape he had consensual oral sex with Lauren, but no intercourse. He insisted, moreover, that Lauren, who had psychiatric problems, had become pregnant by an unidentified boyfriend and then accused Bakalov of rape to avoid excommunication from her church.

¶ 9 The Legal Defenders Association (LDA) was appointed to represent Bakalov in his first trial. Bakalov objected to LDA representation because it is state-funded. On appeal, this Court overturned Bakalov's conviction, holding that Bakalov had been deprived of his Sixth Amendment right to self-representation. *State v. Bakalov*, 862 P.2d 1354, 1354–55 (Utah 1993) (per curiam).

After remand, the trial court, Judge Richard H. Moffat, attempted to conduct a *Frampton* colloquy with Bakalov to assess whether he unequivocally and knowingly waived his right to assistance of counsel. Bakalov refused to answer the court's questions and insisted that he be assigned non-LDA or out-of-state counsel. LDA-conflicts counsel was appointed but soon withdrew because Bakalov refused to cooperate. Judge Moffat then permitted Bakalov to defend himself and appointed standby counsel. Judge Michael R. Murphy took over the case, substituted new standby counsel, and, after several aborted attempts, held a successful *Frampton* colloquy with Bakalov. Judge Murphy allowed Bakalov to proceed pro se, assisted by standby counsel.

¶ 10 At trial, Bakalov moved to compel cross-testing of the Code R semen sample with his blood. The trial court granted the request subject to Bakalov's first submitting a sample of his blood to the State. When Bakalov refused, the motion was denied. Additionally, the court rejected Bakalov's request to call an expert witness to testify that intact sperm could not be found 72 hours after intercourse. Also during trial, the court cut short Bakalov's cross-examination of Deanna Ludlow, who had a plane to catch, because, in its view, Bakalov's questions had become irrelevant, time consuming, and harmful to his case. Only two LDA investigators testified for Bakalov because he did not timely submit a list of witnesses and because the list, when submitted, was grossly incomplete, listing such names as "boyfriend," "heart attack," and "Joe Neighbor." The jury in the second trial rejected all Bakalov's defense claims and convicted him as charged. The court sentenced Bakalov to the same prison term imposed on him following his first conviction. In addition, the court recommended to the Board of Pardons that Bakalov never be paroled and imposed a $10,000 fine.

¶ 11 Following the second trial, Lauren spoke with a Salt Lake City newspaper reporter about her rape, her childhood sexual and physical abuse, and her mental health. She told the reporter that she had been diagnosed by her therapist, Dr. Judith Brady, with multiple personality disorder, now known as dissociative identity disorder (DID),[1] and described the nature of her multiple personalities and her therapy. Lauren authorized the reporter to speak with Dr. Brady about her therapy. *See* Katharine Biele, *Soul Asylum, A woman with multiple personalities tries to piece together reality after rape*, Private Eye Weekly, May 25, 1995, at 7. Lauren acknowledged that the information published in the reporter's article was accurate. The therapist stated that Lauren suffered from DID prior to the alleged rape, but did not recognize her illness until she sought post-trauma counseling. Characteristics of DID include amnesia and memory gaps that are often later filled in and symptoms caused by two or more personalities, each with its own behavior patterns and memories, competing for dominance within the patient.

¶ 12 Dr. Brady informed the prosecutor before the second trial of Lauren's diagnosis. Further, she gave the prosecutor a 3 × 5 card with questions to use in his direct examination of Lauren to keep Lauren focused. She also arranged for Lauren to telephone her two or three times a day during the duration of trial. The prosecutor did not communicate information about the DID diagnosis to the defense. Bakalov, however,

---

1. A witness suffering from multiple personality disorder has two or more competing personalities, each with unique memories, behavior patterns, and social relationships. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* § 300.14, at 269 (3d ed. rev.1987). Only one personality presents itself externally at a time, although other personalities may "listen in" on external events. *See id.* at 270. Thus, the witness's recollection of personal history, both remote and recent, may be incomplete or distorted depending on which personality dominates a given moment. *See id.*

Moreover, transition between personalities is often triggered by psychological stress, and the disease tends to be chronic rather than episodic. *See id.* at 269–70, 271.

A fourth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV) issued in 1994 after the victim was diagnosed with multiple personality disorder. This new edition redesignated the disease as dissociative identity disorder and updated the diagnostic standard for the disease. *See id.* § 300.14. Although it differs from the nomenclature used in the trial court below, we will refer to the disorder as DID.

knew before trial that Lauren suffered some psychiatric infirmities. He knew of her counseling, and claimed as a basis of his defense that Lauren was unstable. Prior to trial, Bakalov moved the court to order a psychiatric examination of Lauren. The court granted this request in part, agreeing to appoint a state-paid forensic psychiatrist of Bakalov's choice. The court also granted Bakalov increased access to a prison telephone so that he could arrange for an expert. Bakalov never informed the court of his chosen expert. Nor did he request the medical records of Lauren's counseling or otherwise investigate his suspicion that Lauren suffered from mental illness. The prosecutor also failed to disclose excerpts from two journals written by Lauren and containing information pertinent to the rape.

¶ 13 Bakalov moved for a new trial based on this non-disclosed evidence. The trial court denied the motion, and Bakalov now appeals both his conviction and the denial of his motion for a new trial. On appeal, Bakalov raises several claims of error. Specifically, he contends (1) that he was deprived of the right to assistance of counsel because he did not unequivocally and knowingly request self-representation; (2) that the trial court erred in denying his motion for new trial because due process required disclosure of the DID evidence and journal extracts; (3) that he was denied due process and a fair trial when not given an opportunity to test the Code R semen sample; (4) that the prosecutor committed reversible misconduct in statements made during closing argument to the jury; (5) that the court improperly permitted the State to call as a witness his former counsel and to elicit testimony from Detective Allen concerning Bakalov's exercise of his post-arrest rights to counsel and silence; (6) that he was denied a fair trial because his requested witnesses were not subpoenaed, he could not call an expert to testify that sperm could not remain intact 72 hours after intercourse, and the court curtailed his cross-examination of State witness Deanna Ludlow; and (7) that the court erred in sentencing him more severely after his

second conviction than after his first conviction. We address each claim in order.

## II. BAKALOV'S RIGHT TO ASSISTANCE OF COUNSEL

¶ 14 Bakalov's first contention of error is that his Sixth Amendment right to the assistance of counsel was violated because he did not unequivocally request self-representation and did not voluntarily, knowingly, and intelligently waive the right to counsel. We do not agree.

¶ 15 The Sixth Amendment of the United States Constitution guarantees each criminal defendant the right to assistance of counsel. *See State v. Frampton*, 737 P.2d 183, 187 (Utah 1987). It is well established that the Sixth Amendment also grants an accused the fundamental right to defend himor herself in person. *See Faretta v. California*, 422 U.S. 806, 818–21, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Frampton*, 737 P.2d at 187 & n. 6; *State v. Hamilton*, 732 P.2d 505, 507 (Utah 1986) (per curiam).[2] These mutually exclusive rights must be construed in harmony with each other as far as possible. *See Faretta*, 422 U.S. at 820–21, 95 S.Ct. 2525. Because a defendant's choice of self-representation often results in detrimental consequences to the defendant, a trial court must be vigilant to assure that the choice is freely and expressly made "with eyes open." *Id.* at 835, 95 S.Ct. 2525 (internal quotation omitted); *see Frampton*, 737 P.2d at 187; *Bakalov*, 862 P.2d at 1355.

¶ 16 To invoke the right of self-representation, a defendant must in a timely manner " 'clearly and unequivocally' " request it. *United States v. McKinley*, 58 F.3d 1475, 1480 (10th Cir.1995) (quoting *United States v. Reddeck*, 22 F.3d 1504, 1510 (10th Cir.1994)). The requirement that a defendant make an explicit request ensures that the defendant will not unthinkingly waive the right to counsel through sporadic musings or, on appeal, mischaracterize statements he

---

2. The right to self-representation in criminal proceedings is also guaranteed by the Utah Constitution as well as by state statute. *See* Utah Const.

art. I, § 12; Utah Code Ann. § 77–1–6(1)(a) (1995).

made in the trial court and claim that he was denied the benefit of counsel if he proceeded pro se, or that he was denied the right to self-representation if he was represented by counsel. *See Adams v. Carroll,* 875 F.2d 1441, 1444 (9th Cir.1989). If a defendant equivocates in his request to represent himself, he is presumed to have requested the assistance of counsel. *See Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). A defendant's assertion of the right of self-representation must be voluntary, the product of a free and meaningful choice. *See Frampton,* 737 P.2d at 187.

¶ 17 These requirements that the request to represent one's self be definite and voluntary do not mean, however, "that [a defendant's] decision to waive counsel must be entirely unconstrained." *Wilks v. Israel,* 627 F.2d 32, 35 (7th Cir.1980). " 'A criminal defendant may be asked, in the interest of orderly procedures, to choose between waiver [of counsel] and another course of action as long as the choice presented to him is not constitutionally offensive.' " *Id.* (quoting *United States v. Davis,* 604 F.2d 474, 485 (7th Cir.1979)).

¶ 18 After we remanded Bakalov's case for a second trial, the district court appointed counsel for Bakalov, who is indigent. Counsel was competent and conflict-free. Bakalov refused to cooperate with assigned counsel, however, and counsel was compelled to withdraw. Bakalov repeatedly insisted that the trial court appoint new counsel from outside the court's jurisdiction and with no association with the LDA. He also insisted that appointed counsel have no contact with the prosecutor, discuss no possibility of plea bargain or deportation to resolve the case, and strictly follow tactics dictated by Bakalov.

¶ 19 Faced with these demands, the trial court presented defendant with the choice of either accepting representation by the attorney who had previously acted as standby counsel or defending himself. Bakalov elect-ed to defend himself. We hold that the options offered defendant were constitutionally permissible and that his choice, however reluctant or conditional, was voluntary and unambiguous.

¶ 20 A defendant cannot be forced to proceed with incompetent counsel or counsel having a conflict of interests: "[A] choice between proceeding with incompetent counsel or no counsel is in essence no choice at all." *Wilks,* 627 F.2d at 36. Requiring a defendant to choose between self-representation and some other course of action does not always enable a defendant to make a totally voluntary decision. "If a choice presented to a petitioner is constitutionally offensive, then the choice cannot be voluntary." *Id.* However, if the defendant's options are constitutionally sound, the choice between alternatives is voluntary. *See id.* In this case, Bakalov does not contest the qualification or impartiality of appointed counsel. Rather, his displeasure with counsel stemmed only from his distrust of lawyers associated with the State. We have clearly held, however, that an indigent defendant "does not have an immutable right under the sixth amendment of the United States Constitution or under our state constitution to reject court-appointed counsel for the purpose of forcing the court to appoint private counsel of his own choice to represent him, absent a showing of good cause for such a change." *State v. Wulffenstein,* 733 P.2d 120, 121 (Utah 1986) (per curiam). Defendant's unsubstantiated fears that LDA or Utah-based attorneys could not fairly represent him is not "good cause" justifying a change in attorneys.[3] *See id.* Thus, Bakalov was "not entitled to pick and choose" his court-appointed counsel "by either the process of an affirmative demand or the selective elimination of other attorneys." *Id.* at 121–22. The alternatives given Bakalov by the trial court—to accept representation by competent counsel as already provided or represent himself—were constitutionally acceptable, and Bakalov's choice was voluntary.[4]

---

**3.** As we stated in *Wulffenstein,* "We refuse to indulge in defendant's suggestions that representation by the public defender's office is an *ipso*

facto denial of his constitutional right to effective assistance of counsel." 733 P.2d at 121.

**4.** The choice, furthermore, was not novel. In *Wulffenstein,* we endorsed the lower court's in-

¶ 21 Bakalov's choice was also decisive. Bakalov made his intention clear ever since remand for a new trial that he wanted to represent himself if the only alternative was representation by appointed counsel. Moreover, his intermittent demands for other counsel stemmed from that same consistent position. "That [the defendant] did not particularly like the choice presented to him [to defend himself or accept representation by appointed counsel] and that he did not want to proceed *pro se* are not sufficient reasons to render the choice constitutionally offensive." *Wilks*, 627 F.2d at 36. We hold that Bakalov's election to defend himself was clear and unequivocal.

■■■■■ ¶ 22 We must next assess whether defendant "knowingly and intelligently" waived his right to assistance of counsel. *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). An accused's decision to represent himself necessarily is a waiver of the right to counsel. *See Frampton*, 737 P.2d at 187. Whether a waiver is knowing and voluntary "turns upon the particular facts and circumstances surrounding each case." *Id.* at 188. Additionally, when, as here, a defendant expressly declines an offer of appointed counsel, "he has the burden of showing by a preponderance of the evidence that he did not so waive this right." *Id.* at 187. We conclude that Bakalov has failed to meet this burden.

■■■■■ ¶ 23 It is the trial court's duty to determine whether a defendant's waiver of the right to counsel was knowing and intelligent. *See id.* To this end, we have recommended that the trial court conduct an on-the-record colloquy with the accused in which the court should fully inform the accused "of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* (citing *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525 (internal quotations omitted)); *see also id.* at 187

n. 12. The court should also carefully evaluate the accused's background, experience, and conduct insofar as they indicate what the accused understands in attempting to waive the right to counsel. *See id.* at 188. The trial court must ensure that the accused comprehends the risks of self-representation and that he relinquishes the benefits of representation by counsel.

¶ 24 In remanding this case for a second trial, we specifically directed the trial court to conduct the recommended colloquy on the record with Bakalov to ensure "that he understands the risks of self-representation and thereby waives his constitutional right to assistance of counsel." *Bakalov*, 862 P.2d at 1355. The trial court complied with our instruction. On remand, the case was assigned to Judge Richard H. Moffat, who attempted to conduct a *Frampton* colloquy with Bakalov. Bakalov, however, doggedly refused to answer the court's questions, insisting that he wanted non-LDA or out-of-state counsel. To best accommodate Bakalov, the court appointed LDA-conflicts counsel Kenneth R. Brown. Bakalov accepted Brown as his counsel only so long as Brown conformed to Bakalov's tactical demands, but two months later Brown moved to withdraw as counsel because Bakalov refused to cooperate with him. In ruling on Brown's motion, Judge Moffat again attempted a *Frampton* colloquy and, again, Bakalov refused to answer questions. Given Bakalov's unwieldy obstinence, the court expressed concerns about Bakalov's competence to waive the right to counsel, but ultimately concluded that Bakalov's rejection of Brown indicated a knowing waiver. Brown was permitted to withdraw, and standby counsel Charles Lloyd was appointed.

¶ 25 Judge Michael R. Murphy next took over the case, allowed Lloyd to withdraw, and appointed Joseph Fratto, who is LDA-conflicts counsel, as new standby counsel. Judge Murphy reviewed videotaped hearings

struction to the defendant who, like Bakalov, insisted that private counsel be appointed to represent him, that the defendant's unjustified rejection of court-appointed counsel would be deemed a waiver of the right to counsel. *Id.* at 121 (citing *United States v. Moore*, 706 F.2d 538, 540 (5th Cir.1983) (holding that defendant is not enti-

tled to demand that his appointed counsel be relieved and that new counsel "who will docilely do as he is told" be appointed: "[A] persistent, unreasonable demand for dismissal of counsel and appointment of new counsel ... is the functional equivalent of a knowing and voluntary waiver of counsel.")).

of Bakalov before Judge Moffat and concluded that Bakalov was competent to knowingly waive his right to counsel.[5] Judge Murphy then attempted another *Frampton* colloquy with defendant. Before the colloquy, Bakalov refused the choice offered to him by the court either to accept Fratto as his direct counsel or to defend himself. Bakalov also again refused to answer the court's *Frampton* inquiries. The court attempted colloquies in three subsequent hearings before Bakalov finally complied. Based on Bakalov's answers in that final, successful colloquy, the court found that defendant knowingly and intelligently waived his right to assistance of counsel.

¶ 26 We conclude that the trial court did not err in making this determination. The court's colloquy with Bakalov was thorough. Moreover, the court was able to interact with and observe defendant at length. Bakalov was psychologically examined and determined to be competent, he was highly educated, he had completed a trial and an appeal with counsel on the same charge, and he had submitted numerous pro se motions to the court asserting rights or requesting materials to aid him in representing himself—all indicating his ability to knowingly waive his right to counsel. The court did not coerce defendant into representing himself. Finally, consistent with our remand instructions, the court appointed standby counsel to preserve defendant's right to representation and to preclude lack of waiver claims on appeal.

¶ 27 Given the above, we affirm the trial court's holding that defendant's waiver was knowing and intelligent. Defendant's Sixth Amendment right to assistance of counsel was effectively waived.

### III. THE PROSECUTOR'S NONDISCLOSURE OF EVIDENCE

¶ 28 Bakalov moved for a new trial on the ground that the prosecutor failed to disclose to the defense evidence that Lauren suffered from DID that Bakalov could have used to impeach Lauren's testimony. After

an evidentiary hearing in which Lauren's counselor testified to her opinion of Lauren's mental state and a psychologist testified as to the symptoms of DID, the trial court denied the motion. Bakalov appeals the denial. We review the legal standards applied by the trial court for correctness. Otherwise we review a trial court's denial of a motion for new trial under an abuse of discretion standard. *See Crookston v. Fire Ins. Exchange,* 860 P.2d 937, 940 (Utah 1993); *State v. James,* 819 P.2d 781, 793 (Utah 1991).

¶ 29 Bakalov maintains that the State intentionally suppressed evidence that Lauren suffered from DID. The State admits that the prosecutor did not disclose to Bakalov that Dr. Brady, Lauren's psychological counselor, thought Lauren suffered from DID; however, the State argues that the DID evidence was not constitutionally material to the events of the rape and that nondisclosure did not violate Bakalov's right to due process under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

#### A. *Prosecutorial Nondisclosure of DID Evidence*

¶ 30 It is fundamental that the prosecution has a constitutional duty under both the Utah and United States Constitutions to disclose material, exculpatory evidence to the defense. Suppression of evidence favorable to the defense "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *see also State v. Jarrell,* 608 P.2d 218, 224 (Utah 1980). This is true irrespective of whether the defense requests the favorable evidence, *see United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *State v. Carter,* 707 P.2d 656, 662 (Utah 1985), or whether the evidence is substantively exculpatory or solely of impeachment value, *see Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375.

---

5. Bakalov also received psychological testing and was found competent to knowingly and intelligently waive the right to assistance of counsel.

Bakalov does not seriously contest his competency on appeal.

¶ 31 Evidence is constitutionally material "if there is a reasonable probability" that the "result of the proceeding would have been different had the evidence been disclosed to the defense." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. In *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (emphasis added), the United States Supreme Court stated:

> *Bagley*'s touchstone of materiality is a "*reasonable probability*" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

The test, therefore, is not whether the defendant would have been acquitted had the evidence been disclosed, but whether the prosecutor's suppression " 'undermines confidence in the outcome of the trial.' " *Id.* (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375).

¶ 32 Evidence showing a witness's inability to accurately perceive, recall, or relate events at issue in a trial may be crucial to establishing the truth. *See United States v. Butt*, 955 F.2d 77, 84 (1st Cir.1992); *see also United States v. Partin*, 493 F.2d 750, 762 (5th Cir.1974). Evidence of mental illness is material when it "may reasonably cast doubt on the ability or willingness of a witness to tell the truth." *United States v. Smith*, 77 F.3d 511, 516 (D.C.Cir.1996). Nondisclosure of evidence that reasonably casts doubt on a witness's veracity and ability to perceive and recall accurately when the prosecution rests much of its case on that witness's testimony may result in a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. A prosecutor must disclose to the defense psychological evidence regarding a government witness whenever that evidence can substantially affect defense counsel's ability to impeach the witness. *See Smith*, 77 F.3d at 515–17; *United States v. Lindstrom*, 698 F.2d 1154, 1166 (11th Cir.1983).

¶ 33 Following the first trial in September 1991 and prior to the second trial in September 1994, Lauren sought psychological counseling from Dr. Judy Brady, a private therapist who held a doctorate in social work. Without any evaluative testing, Dr. Brady formed the opinion that Lauren suffered from DID. That opinion was based on Lauren's self-reporting and criteria stated in the *Diagnostic and Statistical Manual of Mental Disorders, 3rd Edition* (DSM–III). Dr. Brady stated that in one therapy session, Lauren, while discussing the rape that is the subject of this case, experienced a "spontaneous flashback" in which she recalled some kind of sexual abuse in her childhood. Dr. Brady concluded that the "personality" relating the childhood abuse was a personality other than Lauren. Other than this episode, Dr. Brady was not able to discern Lauren's "switching" or changing from one personality to another.

¶ 34 The second trial occurred in September 1994. Prior thereto, in April or May 1994, Dr. Brady informed the prosecutor that in Dr. Brady's opinion Lauren "might have multiples." Dr. Brady thought that the prosecutor did not accept her opinion, and did not believe that "I [Dr. Brady] was necessarily competent to make that assessment." Nevertheless, the prosecutor reviewed the DSM–III criteria and asked Dr. Brady a number of questions, including whether Lauren's recollection of the rape was any different from that to which she had testified at the first trial. Dr. Brady provided the prosecutor with a 3 × 5 card with instructions as to techniques for keeping Lauren from dissociating while testifying at trial. The prosecutor did not inform Bakalov of Dr. Brady's opinion that Lauren had DID or that Dr. Brady had given the prosecutor the 3 × 5 card for use in the examination of Lauren at trial.

¶ 35 In 1995, the year following Bakalov's second conviction, Lauren was interviewed by a reporter about the rape, her DID, and the prosecutor's knowledge of Dr. Brady's opinion. The reporter wrote an article that appeared in the *Private Eye Weekly*. Based on the article, defendant moved for a new trial. The trial court conducted an evidentia-

ry hearing and took extensive evidence from Dr. Brady and Dr. Vicki Gregory, a Ph.D. psychologist, who testified as an independent expert for defendant. Dr. Gregory testified as to evidence concerning the nature and symptoms of DID. Dr. Brady testified to her opinion as to whether and how DID may have affected Lauren and whether DID might have affected Lauren's trial testimony.

¶ 36 The trial court found that the prosecutor had not disclosed to defendant his knowledge of Dr. Brady's opinion concerning Lauren's DID or the prosecutor's use of the 3 × 5 card provided by Dr. Brady to guide the prosecutor in his examination of Lauren at the second trial. Nevertheless, the trial court denied the motion for a new trial. It ruled that the evidence did not show that Lauren was affected by DID at the time of the rape and that Lauren's trial testimony was not affected by DID. That ruling was based on Dr. Gregory's testimony that "memory gaps and amnesia [are] one of the major diagnostic criteria of DID." [6] As to the nature of the amnesia that is symptomatic of DID, Dr. Gregory testified: "Let me say it's inability to recall important personal information that's too extensive to be explained by ordinary forgetfulness. That is a gap in memory." Therefore, if one did not have gaps in his or her memory, one would not have DID: "[I]t would be something other than that." Dr. Brady testified that although Lauren had experienced periods of amnesia or loss of memory about early childhood events related to child sexual abuse, *Lauren had not experienced any amnesia or loss of memory related to the rape.* Dr. Brady affirmed that Lauren's memory of the rape was intact and concrete as to the occurrence and the events surrounding the rape and as to events subsequent thereto. The evidence concerning Lauren's ability to perceive and to recall those events accurately was uncontradicted. There was no evidence that Lauren confabulated any events concerning the

rape or that some "personality" other than Lauren had consented to sexual intercourse with defendant.

¶ 37 In ruling on the new trial motion, the trial judge stated that it was clear that "defendant was not provided the view of Judy Brady that the victim had dissociative identity disorder or multiple personality disorder." On the basis of the evidence adduced at the hearing on the motion for a new trial, the trial court found that, factually, there had been "no showing that she [Lauren] was affected by these purported disorders at the time of the rape, *nor has it been shown that her testimony was affected by any such purported disorder.*" On that basis, the trial court concluded that "there would [not] have been any material difference in the outcome of the verdict in the trial" had the DID evidence been disclosed, and thus no due process violation occurred. The trial court also assumed that defendant did not have exhibits 1014 and 1015, written summaries of Lauren's personal journal entries relating to Bakalov, but nevertheless held that they were not sufficient to persuade the court that, had the defendant received those exhibits along with the DID information, "there would have been any material difference in the outcome of the verdict in the trial, and that the court's confidence in the guilty verdict is not undermined."

¶ 38 Given the state of the record and the position of the parties at the time of trial, it is clear that the prosecutor should have disclosed to defendant prior to trial the existence of Dr. Brady's opinion and the use of the 3 × 5 card. Although the prosecutor indicated that he did not accept Dr. Brady's opinion, he nonetheless took actions designed to deal with the DID symptoms had they appeared in Lauren at trial. It is not for a prosecutor to substitute his or her judgment for that of a defendant with respect to

---

6. She relied on DSM–IV, which states:

   The essential feature of Dissociative Identity Disorder is the presence of two or more distinct identities or personality states (Criterion A) that recurrently take control of behavior (Criterion B). *There is an inability to recall important personal information, the extent of which is too great to be explained by ordinary* *forgetfulness (Criterion C).* The disturbance is not due to the direct physiological effects of a substance or a general medical condition (Criterion D). In children, the symptoms cannot be attributed to imaginary playmates or other fantasy play.

   DSM–IV, *supra* note 1, § 300.14, at 484 (emphasis added).

whether exculpatory evidence is sufficiently material to warrant disclosure to a defendant when the question is at all close. Where a judgment call must be made as to whether evidence is sufficiently exculpatory to be *Brady* material, doubts should be resolved in favor of disclosure.

¶ 39 Nevertheless, the evidentiary hearing *after* the trial established that the evidence withheld was not in fact probative of Lauren's ability to perceive, recall, and relate accurately the events of the rape. The trial court's findings of fact in this regard are well supported by the evidence. For that reason, the undisclosed DID evidence was not constitutionally material because there was not a "reasonable probability" that the result of the proceeding would have been different if the evidence had been disclosed. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). For the same reason, we hold that the trial court did not err in denying the motion for a new trial.[7] *State v. James*, 819 P.2d 781, 793 (Utah 1991).

### B. Disclosure of Journal Entries

¶ 40 Defendant also asserts that the prosecutor violated due process by failing to disclose excerpts from Lauren's journal entries covering the days surrounding the alleged rape. He argues that the journal evidence was exculpatory and constitutionally material under *Brady*.

¶ 41 The State admits that the journal evidence could have been used to impeach Lauren on some issues, but it argues that the journals were in fact disclosed, and that in any event, the journal entries were not constitutionally material. The prosecutor testified that he remembered giving at least one of the excerpts to defendant and believed that both must have been disclosed. Defendant claims never to have received them. The trial court did not decide the issue. We hold that the trial court did not err in denying the motion for a new trial on this basis.

¶ 42 At the prosecutor's request and in an effort to avoid having to disclose her entire journal, Lauren summarized her journal entries relating to defendant in two separate documents, exhibits 1014 and 1015. Both summaries cover the same time period, although their specificity differs. Among other things, the excerpts detail Lauren's romantic interest in Bakalov and her demonstrations of that interest. They are inconsistent with Lauren's trial testimony as to the date on which Bakalov first visited Lauren's apartment. They also state that Lauren telephoned Bakalov the day following her alleged rape to invite him to attend a church conference.

¶ 43 The trial judge found that this information was contained in another exhibit that defendant utilized. Our review of the record supports this finding. Exhibit 1021 contained notes of Lauren's testimony at the preliminary hearing, discussing Lauren's initial interest in Bakalov. Lauren made the same inconsistent statement about dates in her preliminary hearing testimony that she made in her journal. In addition, at trial Lauren admitted her attraction to Bakalov and described the telephone call she made to Bakalov the day after her rape.

¶ 44 Furthermore, Bakalov knew that the journals existed. "We are not inclined to accept [the defendant's] assessment on appeal that the [journal excerpts] had great significance to the defense when the defendant did not even request to see them once their existence had been disclosed." *State v. Schreuder*, 712 P.2d 264, 276 (Utah 1985).

¶ 45 As stated, due process requires a prosecutor to disclose all exculpatory evidence that is material to guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *State v. Jarrell*, 608 P.2d 218, 224 (Utah 1980). Evidence is material when it is reasonably probable that disclosure would affect the outcome of the criminal proceeding. *See Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. Given the exis-

---

7. The trial court also found, as an alternative ground for its holding that the assumed nondisclosure did not violate *Brady*, that defendant could not have effectively utilized the information had it been disclosed. Defendant's skill in presenting a defense is irrelevant in analyzing *Brady*. Due process entitles the defendant to all constitutionally-material, exculpatory evidence, regardless of the defendant's adeptness at employing the evidence at trial.

tence of the other evidence, it is not reasonably probable that disclosure of the journal entries would have affected the outcome of the trial and they were not, therefore, constitutionally material.

## IV. THE COURT'S DENIAL OF DEFENDANT'S MOTION TO TEST THE CODE R SEMEN SAMPLES

¶ 46 Defendant next contends that the trial court committed reversible error in refusing to permit him to test the Code R semen sample, consisting of vaginal washings and specimens from a vaginal smear, that was collected from the victim in her Code R, or rape, examination. The Code R sample, when dyed and examined microscopically, tested positive for rare intact sperm.[8] However, the sample was not submitted to DNA or other blood type testing, according to the State, because of the sample's small size and because the dye used to enable a microscopic view of the sperm destroyed the lab's ability to perform additional testing. Furthermore, the State did not have an undisputed sample of defendant's blood that could be compared against the Code R sample.

¶ 47 The vial and slide containing the Code R sample were misplaced while in the court's custody and could not be located when the parties met in July 1994 to review the exhibits in preparation for the second trial. However, both the vial and the slide were found inside of another exhibit the day before trial was to begin, September 19, 1994, and standby counsel moved for a continuance so that cross-testing of the Code R sample with defendant's blood could be performed. The trial court denied the motion for continuance, but ruled that defendant could test the Code R sample while trial proceeded provided that (1) defendant submit a sample of his blood and (2) if testing excluded defendant the State would dismiss all charges. Defendant, nonetheless, refused to provide the comparison sample. Based on this refusal, the motion for testing was denied.

¶ 48 Defendant argues that the trial court's denial of the motion for testing violated due process because the Code R sample, having potentially exculpatory import, should have been tested and disclosed to defendant by the State under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and because depriving defendant of an opportunity to test the sample also deprived him of the basic tools he needed to adequately present his case.

■ ¶ 49 Defendant's *Brady* claim in this regard is without merit. As discussed above, *Brady* prohibits suppressing evidence favorable to the defense "where the evidence is material either to guilt or to punishment." *Id.* at 87, 83 S.Ct. 1194. Defendant urges that we hold the untested semen sample in this case to be constitutionally material. Both this Court and the United States Supreme Court have rejected that view, however. In *State v. Shaffer*, 725 P.2d 1301 (Utah 1986), we held that the "mere possibility" that undisclosed evidence might favor a defendant cannot establish a *Brady* violation. *Id.* at 1305–06; *see also State v. Lovato*, 702 P.2d 101, 106–07 (Utah 1985). Likewise, the United States Supreme Court held in a case with similar facts to this that "[t]he possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality." *Arizona v. Youngblood*, 488 U.S. 51, 56 n. *, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). We cannot simply presume that blood type analyses of the semen sample would yield results favorable to defendant. Rather, the exculpatory value of untested or unavailable evidence "must be apparent" before discovery is mandated by *Brady*. *Id.* (citing *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)).

■ ¶ 50 Further, while due process may demand that the State reasonably maintain evidence potentially favorable to a defendant, it does not require that the State " 'search for exculpatory evidence, conduct tests, or exhaustively pursue every angle on a case.' " *Shaffer*, 725 P.2d at 1306 (quoting *State v.*

---

8. The victim did not report the alleged rape until nearly three days after the incident. Intact spermatozoa are rarely found between 24 and 72 hours after intercourse and almost never found after 72 hours.

*Hall,* 22 Wash.App. 862, 593 P.2d 554, 558 (1979)). To make such a demand on the prosecution, indeed, would be "to require the impossible." *Id.* Evidence such as the Code R sample in this case is fragile, is subject to decay, and may tolerate only limited analysis. Performing one sort of test important to the prosecution may preclude conducting other tests. Also, evidence becomes relevant in a particular case only after the legal theories in the case have been identified. Due process does not extend to forcing the prosecutor to divine a defendant's legal theories or to forego conducting evidentiary analyses favorable to the State's case.

¶ 51 Defendant's second due process argument is more credible. Generally, a defendant's right to a fair trial assures the defendant access to the " 'basic tools' " or "raw materials integral to the building of an effective defense." *Ake v. Oklahoma,* 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (quoting *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971)). In this case, defendant argues that he was deprived of those tools when the trial court refused to permit his testing of the Code R semen sample. We do not agree.

¶ 52 We acknowledge that fundamental fairness may in some cases be violated "when a criminal defendant ... is denied the opportunity to have an expert of his choosing, bound by appropriate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion." *Barnard v. Henderson,* 514 F.2d 744, 746 (5th Cir.1975); *see also* Annotation, *Right of Accused in State Courts to Have Expert Inspect, Examine, or Test Physical Evidence in Possession of Prosecution—Modern Cases,* 27 A.L.R.4th 1188 § 4 (1984 & Supp.1998). However, there is no such violation when the evidence to be evaluated is not "critical." *Gray v. Rowley,* 604 F.2d 382, 383 (5th Cir.1979); *see also Barnard,* 514 F.2d at 746. " 'Critical evidence' is material evidence of substantial probative force that 'could induce a reasonable doubt in the minds of enough jurors to avoid a conviction.' " *Gray,* 604 F.2d at 383–84 (quoting *White v. Maggio,* 556 F.2d 1352, 1357–58 (5th Cir.1977)). In *Gray,* the defen-

dant, convicted of rape in state court, challenged his conviction on habeas review because he was not permitted an independent examination of seminal fluid found on the rape victim's clothing. The Fifth Circuit held that the seminal fluid and expert testimony concerning it were not "critical evidence" because the defendant had not provided the state with his blood type and, without that information, the seminal fluid could not be linked to him. *Id.* at 383. Identical facts exist in this case. Bakalov's repeated refusal to provide a blood sample to the State has prevented matching his blood with the semen contained in the Code R sample; without information about his blood, there is no nexus to connect the semen sample to Bakalov. As a result, the Code R sample is not critical to a determination of Bakalov's guilt or innocence, and the trial court's refusal to permit defendant to independently examine the semen sample was not error.

¶ 53 Our holding on this issue is reinforced by the possibility that the Code R sample was, as the State contends, consumed in the State's initial dye testing. Biological evidence, especially when obtained in small quantities, is highly volatile, and limited chemical testing can consume an entire sample, rendering it useless to further analysis. The strictures of due process accommodate this reality, recognizing that the "failure to preserve potentially useful evidence does not constitute a denial of due process" unless the criminal defendant can show bad faith on the part of the State. *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333. Accordingly, evidence consumed in testing because of its destructible nature, as here, cannot be considered "evidence whose nature is subject to varying expert opinion," which due process entitles a defendant to subject to testing. *Barnard,* 514 F.2d at 746.

¶ 54 Finally, even were defendant entitled to an opportunity to have his own expert evaluate the Code R sample under *Barnard,* the condition for testing imposed by the trial court was reasonable. Defendant had previously refused court orders requiring him to provide blood samples to the

State, and he specifically refused to provide a sample for cross-matching with the Code R sample. It was defendant's refusal to abide the court's precondition—i.e., that he submit a blood sample—that resulted in the court's denial of his motion for testing. Because the trial court's condition was geared to assuring the relevance of the Code R testing, it comported with Utah Rule of Criminal Procedure 16(h)(6), requiring an accused to "permit the taking of samples of blood," and Rule 16(g), authorizing the court to sanction in any way "it deems just" a defendant who fails to comply with a discovery order. Utah R.Crim. P. 16(g), (h)(6). Rule 16 "grants a trial court ample discretion to remedy any prejudice to a party resulting from a breach of the criminal discovery rules." *State v. Larson,* 775 P.2d 415, 418 (Utah 1989) (citing *State v. Knight,* 734 P.2d 913, 918 (Utah 1987)); *see also Barnard,* 514 F.2d at 746 (stating that the opportunities for testing critical evidence may be limited by "appropriate safeguards imposed by the Court"); Wendy Evans Lehmann, J.D., Annotation, *Sanctions Against Defense in Criminal Case for Failure to Comply with Discovery Requirements,* 9 A.L.R.4th 837 § 3 (1981). Defendant refused to provide the ordered blood sample and in so doing declined his due process opportunity to have an independent expert evaluate the Code R sample. As stated by the California Supreme Court, "Forcing such a choice does not violate the constitution or any other provision of law." *People v. Cooper,* 53 Cal.3d 771, 281 Cal.Rptr. 90, 809 P.2d 865, 889 (1991).

## V. THE PROSECUTOR'S ALLEGEDLY IMPROPER CLOSING STATEMENTS

¶ 55 We now turn to Bakalov's assertion that the prosecutor made improper comments in his closing arguments to the jury. Bakalov identifies numerous comments that he claims were improper. Specifically, he avers that the prosecutor vouched for the complaining witness, suggested that the State required the jury to convict defendant, argued outside of the scope of the evidence, gave the jury a false impression of the evidence, and asked jurors to imagine themselves as defendant's victims.

¶ 56 To prevail in this claim, defendant must show that the remarks "called to the jurors' attention matters which they would not be justified in considering in reaching a verdict" and, if so, that the remarks were harmful. *State v. Creviston,* 646 P.2d 750, 754 (Utah 1982). Furthermore, because defendant did not object to the statements during trial, he also must demonstrate plain error, meaning that error was obvious and substantially prejudicial. *See State v. Dunn,* 850 P.2d 1201, 1224 (Utah 1993). In assessing whether there was prejudicial error in the prosecutor's comments, we will consider the comments both in context of the arguments advanced by both sides as well as in context of all the evidence. We have repeatedly observed "that counsel for each side has considerable latitude [in closing arguments] and may discuss fully his or her viewpoint of the evidence and the deductions arising therefrom." *Id.* at 1223.

¶ 57 Throughout his closing arguments, the prosecutor several times commented to the jury, "You know that [Lauren] told the truth" or "She told the truth." Defendant characterizes these statements as testimonials to Lauren's credibility. We disagree. It is true that a prosecutor engages in misconduct when he or she expresses personal opinion or asserts personal knowledge of the facts. *See State v. Parsons,* 781 P.2d 1275, 1284 (Utah 1989). However, a prosecutor may draw permissible deductions from the evidence and make assertions about what the jury may reasonably conclude from those deductions. *See id.* Here, the prosecutor's comments about Lauren's credibility were not statements of personal belief but, rather, assertions about what the jury should infer from the evidence during their deliberations.[9]

---

9. The trial court considered the propriety of these comments in ruling on defendant's motion for new trial:

   I have looked at those comments, and they appear to me to be appropriate in the context of the closing argument. The prosecutor was not vouching for the witness. In fact, the thrust of it was that the evidence was so compelling that the reference was to "you", from the transcript, meaning the jury, "you can de-

Moreover, the prosecutor's statements responded to Bakalov's repeated assertions that Lauren had deliberately fabricated her rape claim. As we stated in *State v. Lafferty,* "[W]e think it very unlikely that a juror would consider these statements to be factual testimony from the prosecutor." 749 P.2d 1239, 1256 (Utah 1988).

¶ 58 Defendant also complains that the prosecutor invoked the prestige of the State to obligate the jury to find defendant guilty. The prosecutor began his closing argument by informing the jurors, incorrectly, that they were now part of the State and then later added: "The State of Utah asks you to do your duty and find [Bakalov] guilty." It is error for a prosecutor to bolster his or her case by implying "that a jury has an obligation to convict a defendant on some basis other than solely on the evidence before it." *State v. Andreason,* 718 P.2d 400, 402 (Utah 1986); *see State v. Hopkins,* 782 P.2d 475, 479–80 (Utah 1989) (quoting *United States v. Young,* 470 U.S. 1, 18–19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). The prosecutor's comments in this case, however, must be viewed in context of the surrounding arguments. *See Hopkins,* 782 P.2d at 480. The record reveals that the prosecutor's introductory statement that jurors belonged to the government was paraphrased from a popular humorist, whom the prosecutor identified to the jury, and was intended to underscore the importance of the jury's impartial fact-finding role. The second remark, furthermore, was sandwiched between an invitation to the jury to acquit Bakalov "if you believe any part of [his] story" and a strong caution to convict only if Bakalov "is guilty *according to the evidence*" (emphasis added). Given the contextual settings of these comments, we find that any error in the statements was harmless. The prosecutor likely did not sway the jury to consider factors other than evidence presented at trial.

termine this. You can see this." I see no impropriety whatsoever.

The trial court's conclusion, supported by both the written transcripts and the court's own impressions of the closing arguments underscores our own.

¶ 59 Defendant also asserts that the prosecutor argued outside of the evidence by stating that Lauren's testimony was consistent at all proceedings, by referring to Lauren's clothing, and by citing the emotional cost Lauren incurred in reporting the rape. Again, we find no merit in defendant's contentions. While encouraging jurors to consider matters outside the evidence is prosecutorial misconduct, *see State v. Troy,* 688 P.2d 483, 486 (Utah 1984), the prosecutor may fully discuss with the jury reasonable inferences and deductions drawn from the evidence, *see Parsons,* 781 P.2d at 1284. We conclude that each of the statements Bakalov complains of were reasonable inferences from admitted evidence. First, Bakalov contends that the prosecutor falsely claimed that Lauren's testimony was consistent throughout all of the proceedings. The record does not support this contention. Indeed, the prosecutor acknowledged minor inconsistencies in Lauren's testimony and simply argued that defendant had not produced any evidence that Lauren had materially changed her testimony despite defendant's allegations to the contrary.[10] Next, the prosecutor's reference to Lauren's clothing was not, in context, to what she wore at trial but to what she wore the night of the rape. Lauren's skirt, which bore a semen stain, and her religious garments, worn as a symbol of her religious commitment, had been admitted as exhibits; they supported the prosecutor's view of how the rape transpired and his inference that Lauren may not have wanted sex. Finally, the prosecutor's comment that the rape cost Lauren "a high price" fairly summarized Lauren's trial testimony about her reluctance to report the rape and the emotional trauma she suffered. In light of this testimony, it was reasonable for the prosecutor to invite the jury to consider this "price" in assessing Lauren's credibility.

¶ 60 Defendant next argues that the prosecutor presented a false impression of the evidence when he stated that Bakalov

10. In any event, defendant responded to the prosecutor's argument in his subsequent closing argument. We have held that such a response may ameliorate the harm of improper comments by the prosecutor. *See Dunn,* 850 P.2d at 1225.

could have tested the Code R sperm sample under a microscope. This statement, defendant asserts, is unsupported by admitted evidence and gives the misleading impression that defendant had to produce evidence to prevail.[11] Indeed, testing of the semen sample taken in Lauren's Code R examination was not admitted to evidence during trial. The context of the statement and established law makes the prosecutor's remark permissible in this case, however. *See Dunn*, 850 P.2d at 1225; *Hopkins*, 782 P.2d at 480. The remark was prompted by Bakalov's claim in his closing argument that the State had deliberately refused to perform DNA testing which, Bakalov alleged, could have exonerated him. The prosecutor thus explained to the jury that DNA analysis was not possible given the physical condition of the sample and that had Bakalov wanted, he could have tested the sample for himself. We recognize that, notwithstanding Bakalov's attacks, the prosecutor ideally should not have argued outside of the evidence; such a foray into facts not adduced at trial was unnecessary to answer defendant's assertions. *See Troy*, 688 P.2d at 486. Nevertheless, we find that the jury's understanding that the prosecutor spoke to counter both the argument that testing was maliciously withheld and defendant's repeated attacks on the prosecutor's integrity mitigated any potential harm from this remark. Indeed, Bakalov's accusations invited the prosecutor's extra-evidentiary reply. *See United States v. Young*, 470 U.S. 1, 18–19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

■■■ ¶ 61 Lastly, the prosecutor argued that jurors had observed defendant in the courtroom and that they saw he "could not take no for an answer." He then asked the jurors to consider how they would have responded to Bakalov's aggressions in assessing Lauren's testimony about her own reactions. Bakalov characterizes this invitation as inciting the jurors' passions by asking them to imagine themselves as his victims. We disagree. The prosecutor did not attempt to emotionally rouse the jurors but asked them, as reasonable people, to consider

the situation Lauren faced. Given the broad latitude accorded counsel in arguing his or her theory to the jury, we have held almost identical remarks by prosecutors to be proper. *See, e.g., State v. Williams*, 656 P.2d 450, 453–54 (Utah 1982) (approving the comment: "Ask yourselves what you would have done under that set of circumstances."). We find no error in the prosecutor's invitation.

¶ 62 In short, Bakalov has failed to establish prejudicial error with regard to any of the above-referenced statements by the prosecutor.

## VI. TESTIMONY FROM DEFENDANT'S FORMER COUNSEL AND THE INVESTIGATIVE OFFICER

¶ 63 Bakalov's fifth claim of error is that the trial court improperly permitted the State to (1) call as a witness defendant's former attorney Edward K. Brass and (2) elicit from the investigating detective testimony regarding defendant's initial exercise of his rights to counsel and silence.

■■■ ¶ 64 We review for abuse of discretion a trial court's decision to allow an attorney to testify. *See Williams*, 656 P.2d at 453. Certainly, judges should exercise great caution in permitting one side to call as a witness an opponent's trial attorney or the prosecutor, since calling counsel who is actively participating in the case could force removal of counsel from the case and "would be incalculably disruptive to the judicial system and oppressive to the opposing side." *State v. Worthen*, 765 P.2d 839, 849 (Utah 1988). In this case, however, Brass was not defendant's trial counsel. Brass represented Bakalov only briefly nearly three years before trial, and their association stemmed more from their having exercised at the same gym than from this abbreviated professional relationship. Indeed, the State called Brass to testify to his observations of Bakalov's weight lifting abilities. The prosecutor did not allow Brass to identify himself as an attorney, much less as Bakalov's former at-

---

11. Bakalov also claims that the statement was false. To the contrary, the prosecutor's assertion that Bakalov could have tested the sample was true. At Bakalov's urging, the trial court had ruled that Bakalov could test the semen sample if he would submit a sample of his blood. Bakalov refused to comply and thereby forfeited his opportunity to test the sample. *See supra* ¶¶ 46–54.

torney, and questioned him only concerning these non-professional observations. Furthermore, the prosecutor properly notified Bakalov before trial that he intended to call Brass; Bakalov did not object then or at trial. Nothing in the record supports defendant's claim that the trial court abused its discretion in permitting Brass to testify.

¶ 65 Nor was there error in the court's allowing the prosecutor to question Detective Allen about defendant's post-arrest silence. Standby counsel moved for mistrial on the basis of this questioning, which motion the trial court denied. The prosecution may not in general refer to or elicit testimony regarding an accused's exercise of the rights to counsel and silence after arrest. *See Doyle v. Ohio,* 426 U.S. 610, 617–20, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *State v. Wiswell,* 639 P.2d 146, 147 (Utah 1981). Nonetheless, we have clearly held that a defendant "forfeit[s] his right to prevent the prosecutor from commenting on his request for counsel [when] he adduce[s] and relie[s] on the evidence as part of his ... defense." *State v. Dunn,* 850 P.2d 1201, 1223 (Utah 1993); *see also State v. Sorrels,* 642 P.2d 373, 375 (Utah 1982) (per curiam). The same principle applies to a defendant's post-arrest silence.

¶ 66 Here, while the prosecutor had called Brass to testify about matters unrelated to his representation of Bakalov, Bakalov elicited privileged information from him, causing the court to warn Bakalov of the dangers. Despite this warning, Bakalov proceeded to extensively question Brass concerning their conversations and Brass's conversations with the detective. Bakalov specifically asked Brass if he told the detective not to interview defendant and asked him to explain why; Brass replied that no attorney should allow a client to speak freely with the police. Bakalov used this testimony in his defense to give an explanation, in addition to a guilty conscience, for fleeing the police when they came to arrest him. Thus, defendant cannot complain about the prosecutor's examination of Detective Allen on essentially the same information.

¶ 67 In any event, we hold that the detective's testimony is not a comment on defendant's exercise of his rights to counsel and silence. *Doyle* prohibits the prosecutor's *use* of defendant's silence to demonstrate guilt. However, we have held that, when an officer testifies to the circumstances surrounding an arrest, a part of which is defendant's silence, without further reference to or comment on the matter either in testimony or argument to the jury, there is no violation of that principle. *See State v. Urias,* 609 P.2d 1326, 1328 (Utah 1980); *see also State v. Singleton,* 693 P.2d 68, 69–70 (Utah 1984). Detective Allen testified that Bakalov wanted to speak to him but that he could not understand Bakalov and so promised a re-interview which did not occur because Brass advised against it. Neither the detective in his testimony, nor the prosecutor in his closing arguments, made any further mention of Bakalov's silence. The jury would not likely have construed this testimony as commenting on defendant's silence. Given the above, the trial court did not abuse its discretion in denying standby counsel's motion for mistrial.

## VII. DEFENDANT'S REMAINING CLAIMS REGARDING SPECIFIC WITNESSES

¶ 68 Bakalov asserts several other claims of error that we have reviewed and found to be meritless. Specifically, he contends that he was deprived of due process and a fair trial because his requested witnesses were not subpoenaed and did not testify. Because he was pro se and imprisoned, defendant had limited ability to locate and contact witnesses.[12] Our review of the record demonstrates, however, that the court, in recognition of this fact, extended Bakalov courtesies not mandated by the rules, repeatedly reminded him of the need to secure defense witnesses, patiently reviewed with him his list of proposed witnesses to determine who could be relevant, and then allowed him to subpoena all those deemed relevant. Despite this effort, defen-

---

12. This limited ability is a natural and foreseeable consequence of his choice of self-representation—a choice, moreover, that the trial court

clearly explained to Bakalov in their *Frampton* colloquy.

dant was consistently unprepared. Moreover, he declined the resources available to him. He refused to cooperate with standby counsel who could have advised him procedurally or utilized the services of LDA investigators and the sheriff's office to locate witnesses. He rejected the benefits of a full defense investigation conducted by LDA investigators for the first trial, labeling the investigation as a "sham." He also failed to profitably use the additional telephone privileges given him while in jail. Hence, there is no factual basis for arguing that the court precluded defendant from securing material witnesses. Trial judges are not required to "redress the ongoing consequences of [a pro se] party's decision to function in a capacity for which he is not trained." *Nelson v. Jacobsen*, 669 P.2d 1207, 1213 (Utah 1983).

¶ 69 Bakalov also asserts that the court did not allow him to present evidence regarding his theory of the case and inappropriately curtailed his cross-examination of a State's witness. In support of his defense that he and Lauren did not have intercourse the night of the rape, Bakalov asked to call witnesses to establish that intact spermatozoa would not have existed 72 hours after intercourse, the time period after which Lauren reported the alleged rape. The trial court denied this request for witnesses, and we affirm that denial. Defendant was granted permission to present slides and various scientific articles already in his possession demonstrating the identical information. Additionally, defendant was permitted to testify to his own extensive medical qualifications and state any knowledge he had. Appointment of a state-paid scientific expert is not mandated when alternative methods for establishing a defendant's claims are adequate. *See Britt v. North Carolina*, 404 U.S. 226, 227–28, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971) (permitting alternatives to transcript); *Jackson v. Ylst*, 921 F.2d 882, 886 (9th Cir. 1990).[13]

¶ 70 Finally, we uphold the court's use of its prerogative to control the courtroom in curtailing defendant's irrelevant and self-prejudicial questioning of witness Dean-

na Ludlow, Lauren's roommate at the time of the rape. The State called Ms. Ludlow, who lived out-of-state, out of order because of delays in the trial and because she had to catch an airplane. On direct examination, Ludlow testified about how she met Bakalov, when she introduced him to Lauren, her knowledge of Lauren's typing for Bakalov, how Lauren appeared when she returned with Bakalov after the rape, and Lauren's subsequent revelation to her that she had been raped. Bakalov cross-examined Ludlow on all these areas and on many unrelated areas, including Lauren's apartment decorations, whether Lauren had intercourse with a boyfriend, and whether Ludlow had been told that Bakalov was a KGB spy. At this point, the trial court invoked Utah Rule of Evidence 611 to end what it viewed as a prolonged and irrelevant examination.

¶ 71 Our review of the record supports this view. Defendant's examination had become irrelevant, confusing for the jury, time-wasting, and self-prejudicial. While a pro se defendant should be given reasonable leeway, the defendant's examination of a witness must nonetheless be relevant and material to the issues. When it is not, a trial court has the power to curtail that examination as part of its Rule 611 power to control the courtroom. The court in this case had repeatedly warned defendant prior to and throughout trial that it would invoke Rule 611 to prevent harassing or irrelevant questioning of witnesses. Indeed, the court invoked the rule several other times at trial. Defendant had ample time to examine Ludlow and had questioned her on all areas broached in direct examination. In fact, Bakalov admitted he had wasted time in examining Ludlow. Finally, the court, in curtailing questioning, took pains to permit defendant to bring forth additional facts or show any inconsistencies by using Ludlow's testimony from the first trial. The trial court did not err in this regard.

## VIII. DEFENDANT'S SENTENCE FOLLOWING THE SECOND TRIAL

¶ 72 Defendant's final contention is that the trial court erred in sentencing him

---

13. Furthermore, defendant testified that the experts he contacted had refused to testify for him.

more severely after his first conviction was reversed on appeal. It is on this point that Bakalov succeeds in part. Following the second trial, Judge Murphy sentenced Bakalov to prison, ordered him to pay restitution for costs incurred in Lauren's counseling and in testing the Code R semen sample, imposed a $10,000 fine, and recommended to the Board of Pardons that he never be paroled unless he is deported under circumstances whereby he cannot reenter the United States. Bakalov argues that the fine and the Board of Pardons recommendation impermissibly augmented his sentence from that imposed after his first conviction.

¶ 73 As we have recognized, the Fifth Amendment of the United States Constitution, applied to state action through the Fourteenth Amendment, mandates that a sentence after reversal of a criminal conviction cannot be more severe than the original sentence, "unless the reason for the increased sentence, based on identifiable conduct by the defendant following the original trial, appears in the record." *State v. Sorensen*, 639 P.2d 179, 180 (Utah 1981). This rule works "to assure that there is no chilling or deterring of the criminal defendant's exercise of his basic constitutional right to appeal." *Id.* at 181. In addition, Utah Code Ann. § 76–3–405 (1995) provides:

> Where a conviction or sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a different offense based on the same conduct which is more severe than the prior sentence less the portion of the prior sentence previously satisfied.

This statute, more stringent than the due process protection, "allows for no exceptions." *Sorensen*, 639 P.2d at 180. The meaning of a "more severe" sentence is clear. "The second sentence cannot exceed the first in appearance or effect, in the number of its elements, or in their magnitude." *Id.* at 181 (citation omitted).

¶ 74 The fine the trial court imposed after the second trial undisputably violates these prohibitions. The State admits as much, acknowledging that the original sentence did not impose a fine. We therefore remand the case for resentencing, instructing the court to eliminate the fine.

¶ 75 The trial court's recommendation to the Board of Pardons, however, is permissible. Under the indeterminate sentencing scheme adopted by this State, " 'the trial judge has no discretion in fixing the term of imprisonment.' " *Labrum v. Board of Pardons*, 870 P.2d 902, 907 (Utah 1993) (quoting *State v. Egbert*, 748 P.2d 558, 563 (Utah 1987) (Zimmerman, J., dissenting)). Instead, "If the trial judge sends [a] defendant to prison, the judge does not determine the number of years the defendant will spend there. That is left to the unfettered discretion of the board of pardons...." *Foote v. Board of Pardons*, 808 P.2d 734, 735 (Utah 1991). The trial judge's recommendation to the board is simply the judge's personal non-binding expression of what length of actual incarceration may be appropriate. It does not increase to any degree the effect or magnitude of a sentence, and accordingly, the recommendation is not prohibited.

## IX. CONCLUSION

¶ 76 For the foregoing reasons, we affirm defendant's conviction of rape and affirm the trial court's denial of a new trial. We remand the case for resentencing consistent with this opinion.

¶ 77 Chief Justice HOWE, Associate Chief Justice DURHAM, Justice ZIMMERMAN, and Justice RUSSON concur in Justice STEWART'S Opinion.