2001 UT 99

**STATE of Utah, Plaintiff and Appellee,**

v.

**Russell Eugene BISNER, Defendant and Appellant.**

**No. 20000026.**

Supreme Court of Utah.

Nov. 20, 2001.

Rehearing Denied Jan. 3, 2002.

Mark L. Shurtleff, Att'y Gen., Jeffrey W. Gray, Asst. Att'y Gen., Robert L. Stott, Salt Lake City, Lana Taylor, Bountiful, for plaintiff.

Richard P. Mauro, Michael R. Sikora, Salt Lake City, for defendant.

RUSSON, Associate Chief Justice:

¶ 1 Defendant Russell Eugene Bisner ("Bisner") appeals from convictions of murder, a first degree felony, in violation of Utah Code Ann. § 76–5–203 (1999), and aggravated robbery, also a first degree felony, in violation of Utah Code Ann. § 76–6–302 (1999). We affirm.

## BACKGROUND

### I. FACTS

¶ 2 On the night of January 5, 1999, sometime between 9:00 and 10:30, Bisner and his friend Derek Pearson ("Pearson") visited Christopher Lyman ("Lyman") at Lyman's apartment to purchase LSD. While at Lyman's apartment, Bisner told Lyman that he was going to meet somebody later that night who owed him "something in th[e] area" of $300. Then, as Bisner and Pearson left Ly-

man's apartment, Bisner declared, "Somebody is going to die tonight."

¶ 3 After leaving Lyman's residence, Bisner and Pearson proceeded to the home of Justin Koontz ("Koontz"), where they gathered with several other friends to "hang[ ] out" and "party[ ]." At the party, the friends consumed alcohol and used various illegal drugs, including marijuana and LSD. During one of the conversations at the party, Bisner mentioned to his friends that he was owed a $350 drug debt by Darby Golub ("Golub"). Shortly thereafter, Bisner telephoned Golub and left him a message that the drug debt was supposed to have been paid that day. Subsequently, at approximately 2:00 on the morning of January 6, Golub called Koontz's house. Golub first spoke with Koontz, and after an angry exchange then spoke with Dustin Symes ("Symes"), another of Bisner's friends attending the party. Golub and Symes also engaged in a vehement argument about the late nature of the calls to the respective residences. This conversation ended with the parties agreeing to meet at a nearby strip mall to settle the dispute.

¶ 4 Following his conversation with Golub, Symes informed Bisner, Koontz, and Pearson of the result of the discussion. Anticipating a fight, the four considered but eventually decided against taking guns with them to the strip mall. Instead, they quickly left in Symes's truck to meet Golub.

¶ 5 When the friends arrived at the strip mall, Golub was not there. Symes therefore drove his truck to a neighboring convenience store where Koontz's mother was working and from which the strip mall could be seen. Approximately five minutes later, Golub arrived and parked his own truck in the parking lot of the strip mall. Upon seeing this, Symes called, "There he is." The four friends waiting at the convenience store then reentered Symes's truck and drove together to the strip mall.

¶ 6 At the strip mall, Symes parked his truck approximately twenty feet from Golub's truck. After Symes parked, Golub stepped just outside of his truck and stood alone with an assault rifle cradled in his arms. Bisner and his friends then exited Symes's truck and advanced on Golub. As

the group approached, Golub backed away, neither firing his rifle nor threatening to do so. Then, Symes, who was carrying an aluminum baseball bat, thrust the bat at Golub, cutting his head, knocking him down, and causing him to drop the assault rifle. Koontz followed Symes's lead by punching Golub in the leg. Golub responded to this attack with confusion, asking, "Why are you doing this?"

¶ 7 Having disarmed Golub, Koontz and Symes retreated to Symes's vehicle. Meanwhile, Bisner and Pearson remained at Golub's truck, forcing him to the ground and beating on him for approximately thirty to forty-five seconds. At that point, Symes yelled for his friends to return to the vehicle. Pearson complied with Symes's request, and just as he, Koontz, and Symes were climbing into their vehicle, Golub lifted himself from the ground and began speeding away in his truck. As Golub began to flee, Bisner took the assault rifle from the ground, cocked it, and fired three times at Golub. Bisner's shots missed, but as Golub continued to speed away through the parking lot, Bisner fired the rifle three additional times. One of those rounds struck Golub in the back of the head and killed him.

¶ 8 Less than an hour later, at approximately 2:40 a.m., Sandy City Police Officer Greg Severson ("Officer Severson") arrived at the strip mall in response to the shooting. At the scene, Officer Severson learned from Koontz's mother, who remained at the convenience store, that Bisner, Koontz, Pearson, and Symes had been involved in a confrontation that ultimately led to the shooting. Accordingly, Officer Severson proceeded to Koontz's home, where Koontz and Pearson were taken into custody. While at the Koontz residence, Officer Severson further learned that Bisner had just telephoned Koontz. Using the number that Bisner had called from, which was recorded on the Koontzes' caller identification service, Officer Severson obtained Bisner's address and traveled there with another Sandy City officer and three sheriff's deputies.

¶ 9 The police arrived at Bisner's home at approximately 5:00 a.m. They then secured the premises, called Bisner on the telephone, and took him into custody at gunpoint after

he exited the house. With Bisner safely in custody, Officer Severson and the Sandy City officer accompanying him holstered their weapons and approached the house to speak with Bisner's mother. The two officers explained that they were still looking for one suspect involved in the shooting and asked Bisner's mother for permission to search her home. Bisner's mother gave her permission for the search, telling the two officers to "go ahead."

¶ 10 Beginning their search, the two officers moved to the basement of the house, where, Bisner's mother had informed them, Bisner lived. Bisner's room had been created at the end of a hallway in the basement, and was separated from the adjoining room by a cloth that had been draped from the ceiling and hung the length of the wall. As the officers descended the stairway into the basement, Officer Severson observed through an opening in this draped entry to Bisner's bedroom a shotgun and an assault rifle resting in a gun rack on the floor of the room. In the basement, Officer Severson also examined, but did not enter, a doorless closet leading out of the hallway adjacent to Bisner's room. However, seeing "just clothing" inside the closet, the officers proceeded to search the house for Symes.

¶ 11 Having cleared the house for any possible suspects, Officer Severson determined an additional search would be necessary due to his discovery of the two weapons in Bisner's room. Officer Severson therefore contacted his commanding officer and requested that a detective be sent to assist him in the search. While Officer Severson was waiting for the detective to arrive, he obtained a "permission to search" form from his patrol car and requested that Bisner's mother sign it so that he could again search her home. The form stated in pertinent part:

> Knowing of my ... CONSTITUTIONAL RIGHT not to have a search made of the premises and property owned by me [without a search warrant] ..., I willingly give my permission to the above named officer(s) to conduct a complete search of the premises and property, including all buildings and vehicles, both inside and outside of the property [referred to herein].

Bisner's mother read the permission form and signed it at approximately 5:30 a.m.

Bisner's sister, who had been present throughout both the search and her mother's conversations with Officer Severson, also signed the form as a witness thereto.

¶ 12 When Detective Mark Soper ("Detective Soper") arrived at approximately 5:35 a.m., Officer Severson advised him of the progress of the search. Detective Soper then asked to speak privately with Bisner's mother. During their conversation, Detective Soper reviewed the permission to search form that she had signed. Bisner's mother reaffirmed that she had read and signed the form, and indicated that she did not have any questions about its meaning. Detective Soper then verbally requested permission to search her home, and Bisner's mother again consented to the search. However, Bisner's mother further advised Detective Soper that Bisner was "supposed to pay rent" for his room but had not done so for "the last two months because he was unemployed."

¶ 13 Upon learning of Bisner's arrangement to pay rent to his mother for use of his room, Detective Soper determined that he would search the house without entering the areas occupied exclusively by Bisner until he could obtain a search warrant allowing him to do so. Commencing his search, Detective Soper, like Officer Severson, was able to view through an opening in the draped entry to Bisner's room the shotgun and assault rifle discovered there in the earlier search. Detective Soper also examined, but did not enter, the doorless closet near Bisner's room. Looking into the closet, Detective Soper saw various clothing that matched a description of Bisner's attire from the day of the shooting. Partially underneath some of the clothing, Detective Soper observed the "black stock" of what "appeared to be [the midsection of] an assault-type rifle."

¶ 14 Subsequently, at approximately 10:30 that morning, Detective Soper obtained a duly executed search warrant commanding a daytime search of Bisner's residence for, among other things, "[a]ny firearms," "[a]ny ammunition," "[a]ny spent shell casings," the clothes Bisner was described to have been wearing just prior to the shooting, and "[a]ny other fruits or instrumentalities that are evidence of the crime of criminal homicide."

Using this search warrant, Detective Soper returned to Bisner's basement bedroom and confiscated various evidence, including the shotgun and assault rifle seen in Bisner's room and the assault rifle in the nearby closet. The assault rifle confiscated from Bisner's closet was the weapon used to kill Golub.

## II. PROCEDURAL HISTORY

¶ 15 On January 11, 1999, the State charged Bisner by information with murder and aggravated robbery, both first degree felonies. On February 22, 1999, Bisner served the State with a written request for discovery. In the interrogatory, Bisner requested production of, among other things, a

[l]ist of all witnesses the [S]tate intends to call at the preliminary hearing, including ... information regarding the details of any cooperation agreements (written or unwritten) between either police officer[s] or the [district attorney]'s office and potential witnesses, including offers of immunity, offers of leniency[,] or other incentives designed to elicit cooperation such as the threat of prosecut[ion] for the homicide as a party.

The State answered this request on March 16, 1999, noting, "The State has not yet determined its witnesses for the preliminary hearing."

¶ 16 On May 10, 1999, Bisner next requested from the State production of a "[l]ist of all witnesses the State intends to call at trial, including ... any information regarding the detail of any written or oral cooperation agreement between any police agency or officer, the State[,] and potential witnesses." The State answered this request on May 18, 1999, informing Bisner that it would provide its list of likely witnesses "[w]hen ... finalized."

¶ 17 Subsequently, on May 11, 1999, Bisner moved the trial court to "suppress all evidence found in [Bisner]'s house, including the gun allegedly used by him in this case." According to the motion, all of the evidence seized from Bisner's residence was inadmissible since the search warrant Detective Soper used to confiscate the evidence was based on information gained during Officer Severson's "warrantless search," which violated Bisner's Fourth Amendment right against unlawful searches and seizures. In response to this motion, the State argued that Detective Soper's search warrant was valid and constitutional because it was obtained only on the basis of information gathered during searches conducted with the express consent of Bisner's mother, who owned the home at issue.

¶ 18 On May 17, 1999, the trial court held a preliminary hearing to consider Bisner's motion to suppress the evidence obtained from his residence. After considering evidence on the matter from both sides, the court denied Bisner's motion to suppress, concluding that his mother, as owner of the house, voluntarily consented to both of the pre-warrant searches that yielded the information from which Detective Soper ultimately obtained his search warrant and seized the evidence at issue. In its subsequent findings of fact and conclusions of law on the matter, the trial court found:

[Bisner's mother] gave her permission ... [for the officers] to make a cursory search of her home to determine if any other suspects were inside.... [Following this preliminary search, Bisner's mother again] willingly gave her permission for the police to complete a search of her premises and property and to take any property which they desired as evidence.

The court therefore ruled, "From the totality of circumstances, [Bisner's mother]'s consent to search on both occasions was given voluntarily.... [Thus,] [b]oth pre-warrant searches conducted by Officer Severson and Detective Soper were valid and lawful. Neither violated any of the defendant's constitutional rights."

¶ 19 Thereafter, on August 19, 1999, less than a week before trial, Bisner moved to exclude "[a]ny evidence as to a monetary debt from a drug deal" between Bisner and Golub. In support of this motion, Bisner asserted that evidence of the drug debt was irrelevant, constituted "inadmissible character evidence" pursuant to Utah Rule of Evidence 404(b), and was thus more prejudicial than probative.

¶ 20 Then, approximately three days before trial, Bisner's attorney learned that Lyman might have entered into two agreements

with the prosecution for his testimony in Bisner's trial. Specifically, after learning from the State that Lyman would be testifying at trial,

> A defense investigator contacted Lyman to discuss his expected testimony and learned that at the time Lyman first spoke to police he had a pending misdemeanor charge, and that after he gave his statement [to the police], someone spoke to the judge on his behalf and he got eight days off of a ten day sentence, the dismissal of a fine[,] and "something else."

Bisner's attorney suspected that the "something else" referred to by Lyman possibly included a "no prosecution" agreement from the State on potential drug distribution charges arising out of his sale of LSD to Bisner and Pearson. Accordingly, on the first day of trial, August 24, 1999, Bisner moved to have the trial court exclude the testimony of "any [S]tate witness [for] whom the State has not provided full disclosure of any agreements, inducements, offers of leniency, or other understandings that the witness would receive some benefit for cooperating or testifying" in Bisner's trial. The basis for this motion was that by failing to disclose any cooperation agreements it had made, the State violated Bisner's due process rights in contradiction to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

¶ 21 After the jury had been impaneled for trial, the trial court conducted a hearing on Bisner's motion to exclude evidence of the drug debt Golub owed Bisner. Ruling that the drug debt evidence was admissible to demonstrate "the purpose of th[e] gathering that resulted in Golub's death," the trial court denied Bisner's motion.

¶ 22 At trial, the State first called Lyman to the witness stand. On cross-examination, Bisner's attorney questioned Lyman at length about any incentive he received for testifying in Bisner's trial. Bisner's attorney first asked Lyman whether he had received "any sort of a deal" for testifying, and Lyman responded: "No, I was not given immunity or any kind of written statement ... that I would not be prosecuted." Bisner's attorney then questioned Lyman about any incentives he had received for giving his statement concerning the case to the police. Lyman stated:

> When I gave the statement [to the police], there really was no agreement. They told me [that they] couldn't promise anything ..., [that] they wouldn't even be able to tell me whether or not they could knock any time off. I basically told [them] what I told you so far[,] and they said they'd see what they could do. I wasn't guaranteed anything at the time of the statement.

However, after further questioning Lyman admitted that for giving his statement to the police, he did eventually have to serve only "two days [in jail] instead of ten days" for a misdemeanor he had committed in events unrelated to Golub's death, and that he "apparently" also avoided imposition of a fine for that crime.

¶ 23 As a result of this admission, Bisner moved the trial court to strike Lyman's testimony from the record. Bisner's attorney argued:

> The [basis] for the motion ... to strike the testimony of Chris Lyman [is] on due process grounds due to an undisclosed cooperation agreement for his testimony.... [T]here is a ... dispute as to whether there was any deal in this case. The Prosecutor has indicated to me that there was none. The evidence elicited from Chris Lyman himself was that there was none. [But i]t is my view that his testimony indicates a de facto deal.
>
> ....
>
> Mr. Lyman agreed that he stated to my investigator that there was [a] ... jail sentence that he got help on, a fine, and something else.... [And] I believe that ... Mr. Lyman was told, perhaps through counsel, that he would not be prosecuted for certain admitted drug distribution charges [arising from his sale of LSD to Bisner and Pearson], which would be second degree felonies.

The State then responded to this argument, attesting that it had not abstained from prosecuting Lyman in exchange for his testimony:

> Yes, Mr. Lyman's attorney was concerned [that Lyman would be prosecuted for drug distribution based on his testimony at trial]. I told him simply that because we ... had no ... corpus of this crime, we

wouldn't be able to prosecute his client because we had no evidence other than his statements that there was a crime committed. So there was no inducement. I didn't promise him I wouldn't prosecute him for his testimony. I just told him a simple fact[:] I couldn't prosecute him.

After considering this evidence, the trial court denied Bisner's motion to strike Lyman's testimony. Finding that Bisner's attorney knew of any potential agreement between Lyman and the authorities involved in his unrelated misdemeanor charge prior to trial—and that it was "quite clear" Lyman had not received "an inducement encouraging him to testify" from the State—the court concluded, "I am just not persuaded that there has been a [due process] violation [in this case]. . . ." The court therefore also denied a motion for directed verdict Bisner had made on the basis that without Lyman's testimony, the State could only prove Bisner had committed manslaughter and not murder because intent could not be established.

¶ 24 Bisner then rested without presenting evidence, and the jury was sent out. Following its deliberations, the jury found Bisner guilty of both murder and aggravated robbery. The jury further found that Bisner had used a dangerous weapon in the commission of Golub's murder.

¶ 25 Subsequently, on September 14, 1999, Bisner moved the trial court to merge his aggravated robbery and murder convictions. To support this motion, Bisner argued that despite this court's holding to the contrary in *State v. McCovey*, 803 P.2d 1234 (Utah 1990), "aggravated robbery is a lesser included offense of murder," and thus, he could not "be convicted of both offenses" pursuant to section 76-1-402(3) of the Utah Code. Relying on *McCovey*, the court denied Bisner's motion.

¶ 26 Thereafter, on October 1, 1999, the trial court sentenced Bisner to an indeterminate prison term of not less than five years for murder and not less than five years for aggravated robbery, with a one-year dangerous firearm enhancement in the commission of murder, all sentences running consecutively.

¶ 27 Following his sentencing, Bisner moved for a new trial on the ground that the State violated his due process rights by "fail[ing] to disclose a cooperation agreement for Chris Lyman . . . in which the State agreed not to prosecute Lyman for drug distribution charges." The court denied Bisner's motion for a new trial in a ruling dated November 23, 1999.

¶ 28 Accordingly, on December 1, 1999, Bisner moved the trial court to reconsider his motion for a new trial pursuant to Utah Rule of Criminal Procedure 24. To support this motion, Bisner argued first that his previous motion "was denied without the hearing requested," and second, that he subsequently "obtained new evidence that the State also failed to disclose cooperation agreements" with Koontz and Pearson.

¶ 29 However, before the trial court could rule on Bisner's motion to reconsider, he appealed his conviction on December 30, 1999. Then, attempting to obtain a ruling on his motion to reconsider, Bisner moved to have his appeal dismissed without prejudice, and we denied his motion in an order dated August 31, 2000:

> Defendant's motion to dismiss this appeal without prejudice while the trial court considers defendant's motion to reconsider . . . is denied. . . . Dismissal of this appeal would necessarily be *with* prejudice, resulting in loss of defendant's appeal. The trial court lacks jurisdiction to consider anything further in this case because defendant timely filed his notice of appeal on December 30, 1999. ·

Consequently, Bisner's appeal of his conviction is now before us.

## ANALYSIS

¶ 30 On appeal, Bisner raises numerous claims of error: (1) that the trial court erred by refusing to grant a new trial, since the State violated Bisner's due process rights by failing to disclose its alleged cooperation agreements with Koontz, Lyman, Pearson, and Symes; (2) that the court committed reversible error by failing to exclude from evidence all information obtained pursuant to Detective Soper's search warrant, which Bisner contends was gained "in violation of the Fourth Amendment"; (3) that the court erred by refusing to exclude evidence of the drug debt Golub owed Bisner; (4) that the court misled the jury by giving a "confusing"

instruction concerning the necessity of convicting Bisner of manslaughter rather than murder if he was found to have been acting "under an extreme emotional disturbance"; and (5) that the trial court should have merged his charges for aggravated robbery and murder. We address each issue in turn.

## I. DUE PROCESS

¶ 31 Bisner first contends that by failing to disclose alleged cooperation agreements it entered into with Koontz, Lyman, Pearson, and Symes, the State violated his due process right to a fair trial, and thus, the trial court should have granted his motion for a new trial made on that basis. "When reviewing a trial court's denial of a motion for a new trial, we will not reverse 'absent a clear abuse of discretion by the trial court.'" *State v. Colwell*, 2000 UT 8, ¶ 12, 994 P.2d 177 (quoting *State v. Harmon*, 956 P.2d 262, 265–66 (Utah 1998)); *see also State v. Bakalov*, 1999 UT 45, ¶ 28, 979 P.2d 799; *State v. Thomas*, 830 P.2d 243, 245 (Utah 1992). At the same time, however, we review the legal standards applied by the trial court in denying such a motion for correctness. *Bakalov*, 1999 UT 45 at ¶ 28, 979 P.2d 799; *see also State v. James*, 819 P.2d 781, 793 (Utah 1991).

¶ 32 Under both the Utah and United States Constitutions, the prosecution bears a "fundamental" duty "to disclose material, exculpatory evidence to the defense" in criminal cases. *Bakalov*, 1999 UT 45 at ¶ 30, 979 P.2d 799. This duty, enunciated first by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), arises regardless of whether the defense requests production of the favorable evidence at issue, *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), since failure to disclose such evidence "violates due process ... irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Likewise, the duty applies both to substantively exculpatory evidence and to that which may be used for impeachment. *Bagley*, 473 U.S. at 676, 105 S.Ct. 3375; *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Bakalov*, 1999 UT 45 at ¶ 30, 979 P.2d 799.

¶ 33 Despite the strictures imposed on prosecutors by this constitutional duty of disclosure, the United States Supreme Court has held that it is in the specific instance where there is "discovery, *after trial*, of information which had been known to the prosecution but unknown to the defense" that reversal of a conviction for nondisclosure is required. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (emphasis added); *see also Bagley*, 473 U.S. at 678, 105 S.Ct. 3375. Accordingly, courts universally refuse to overturn convictions where the evidence at issue is known to the defense prior to or during trial, where the defendant reasonably should have known of the evidence, or where the defense had the opportunity to use the evidence to its advantage during trial but failed to do so.[1] As the

---

[1] *See, e.g., United States v. Wadlington*, 233 F.3d 1067, 1076 (8th Cir.2000) (refusing to find a *Brady* violation where the defendant "was already aware of the substance of the [undisclosed] statements prior to trial"); *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir.1999) (holding that a defendant's "independent awareness of the exculpatory evidence is critical" because "[i]f a defendant already has a particular piece of evidence," production by the prosecution "is considered cumulative"); *Rector v. Johnson*, 120 F.3d 551, 560 (5th Cir.1997) (finding that evidence is not suppressed if the defendant "knew, or should have known of the essential facts permitting him to take advantage of any exculpatory evidence"); *United States v. Zackson*, 6 F.3d 911, 919 (2d Cir.1993) (rejecting a claim of a *Brady* violation because the defendant "was ... aware that [a witness's] cooperation may have warranted some additional investigation");

*United States v. Aichele*, 941 F.2d 761, 764 (9th Cir.1991) ("When ... a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government."); *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir.1991) (employing the *Rector* standard); *United States v. Clark*, 928 F.2d 733, 738 (6th Cir.1991) (using the *Mullins* standard); *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir.1990) (following the Eleventh Circuit's approach in *Davis*); *United States v. Pandozzi*, 878 F.2d 1526, 1528 (1st Cir.1989) (finding no *Brady* violation where defense could have obtained the information "'with any reasonable diligence'" (quoting *Jarrell v. Balkcom*, 735 F.2d 1242, 1258 (11th Cir.1984))); *United States v. Adams*, 834 F.2d 632, 634 (7th Cir.1987) ("*Brady* ... does not mandate pretrial disclosure. Instead, 'the appropriate standard to be applied ... is whether the disclosure came so late as to

Sixth Circuit held in *United States v. Mullins,*

> [T]he government's failure to disclose potentially exculpatory information does not violate *Brady* "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' or where the evidence is available to defendant from another source."

22 F.3d 1365, 1371 (6th Cir.1994) (quoting *United States v. Clark,* 928 F.2d 733, 738 (6th Cir.1991) (quoting *United States v. Grossman,* 843 F.2d 78, 85 (2d Cir.1988))). Indeed, any mandate to the contrary would belie the fundamental objective of the prosecution's duty to disclose, for the purpose of this requirement is to ensure a fair trial. The United States Supreme Court has itself observed: "[The] purpose [of the *Brady* rule] is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial[.]" *Bagley,* 473 U.S. at 675, 105 S.Ct. 3375 (footnotes omitted); *see also United States v. LeRoy,* 687 F.2d 610, 619 (2d Cir.1982). In short, a *Brady* violation occurs only where the state suppresses information that (1) remains unknown to the defense both before and throughout trial and (2) is material and exculpatory, meaning its disclosure would have created a "reasonable probability" that "the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375.

¶ 34 In this case, Bisner contends that the State committed multiple due process violations in contravention to the *Brady* rule, requiring us to overturn his convictions on appeal. Specifically, Bisner argues that the State failed to disclose cooperation agreements it allegedly entered into with a number of its witnesses, including Lyman, and also Koontz, Pearson, and Symes.

### A. Nondisclosure of the Alleged Agreement with Lyman

■ ¶ 35 Bisner asserts that the State failed to disclose two separate incentives it allegedly provided to Lyman for testifying in Bisner's trial: first, a reduction in the jail time Lyman was required to serve and the fine he was ordered to pay for an unrelated misdemeanor he committed, and second, a "promise not to prosecute" Lyman for selling Bisner and Pearson LSD on the night of Golub's death. According to Bisner, the State's failure to disclose these alleged incentives "is reversible error."

■ ¶ 36 However, as explained above, prosecutorial nondisclosure of information favorable to the accused does not by itself constitute prejudicial error requiring reversal of a conviction. *See, e.g., Bagley,* 473 U.S. at 675, 105 S.Ct. 3375; *LeRoy,* 687 F.2d at 619. Rather, nondisclosure violates due process under *Brady* only if the evidence at issue is material and exculpatory, and if the defense did not become aware of the evidence until after trial. *See Bagley,* 473 U.S. at 678, 105 S.Ct. 3375; *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392; *Mullins,* 22 F.3d at 1371; *see also supra* note 1. Accordingly, even assuming that the cooperation agreements alleged here by Bisner actually existed—and observing that their substance would qualify by definition as *Brady* material for its impeachment value, *see Giglio,* 405 U.S. at 154–55, 92 S.Ct. 763—the State's nondisclosure of such evidence necessitates reversal only upon a determination that the defense was never afforded an opportunity to impeach Lyman with the information because the defense did not become aware of it until after Bisner's trial ended.

¶ 37 Importantly, there is no question in this case that the defense knew days before trial about the State's alleged agreement to

---

prevent the defendant from receiving a fair trial.' " (citations omitted)); *United States v. Davis,* 787 F.2d 1501, 1505 (11th Cir.1986) ("[T]he *Brady* rule does not apply if the evidence in question is available to the defendant from other sources."); *Xydas v. United States,* 445 F.2d 660, 668 (D.C.Cir.1971) (holding that the prosecution's failure "to disclose the contested grand jury statement was not reversible error, since under the circumstances ... reasonable pre-trial preparation by the defense would either have confirmed, denied, or rendered immaterial" the evidence in dispute).

reduce the jail sentence and fine imposed in Lyman's unrelated misdemeanor in exchange for his testimony in Bisner's trial. The defense itself admitted in its motion for a new trial:

> A few days prior to trial, ... [a] defense investigator contacted Lyman to discuss his expected testimony and learned that at the time Lyman first spoke to police he had a pending misdemeanor charge, and that after he gave his statement [to the police], someone spoke to the judge on his behalf and he got eight days off of a ten day sentence, the dismissal of a fine[,] and "something else."

Indeed, it was because he was aware of the possibility of this agreement with Lyman that Bisner's attorney was able to use this information extensively at trial in an attempt to impeach Lyman's testimony. Bisner's attorney asked Lyman whether he received "any sort of deal for ... giving th[e] information" about what Bisner had said to him earlier that night, whether he had "talk[ed] [with the police] about getting out of some jail time if [he would] cooperate," and whether it was his "understanding that if [he] cooperate[d] and g[a]ve a statement to the police[,] that [he] would not have to serve ... eight [additional] days" in jail. In fact, Lyman conceded during this questioning that he had received a reduction in his sentence, stating that he had to serve only "two days [in jail] instead of ten" and that he "apparently" also avoided an imposition of a fine for his commission of the misdemeanor. As a consequence, Bisner's claim that his due process rights were violated by the State's failure to disclose this alleged agreement with Lyman is wholly without merit. Not only does the defense admit that it knew about this alleged agreement days before trial, but Bisner's attorney actually used the information for the precise purpose the Constitution requires its disclosure: impeachment. *See Giglio*, 405 U.S. at 154–55, 92 S.Ct. 763. Therefore, the State's nondisclosure of its alleged agreement to seek a reduction in Lyman's misdemeanor sentence in exchange for his testimony does not constitute a *Brady* violation. *See Mullins*, 22 F.3d at 1371; *Grossman*, 843 F.2d at 85; *see also, e.g., United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir.2001) ("*Brady* applies only where the allegedly exculpatory evidence was not disclosed in time for the defendant to make use of it."); *United States v. Adams*, 834 F.2d 632, 634–35 (7th Cir.1987) (same); *United States v. Sweeney*, 688 F.2d 1131, 1141 (7th Cir.1982) (holding that the defendants' due process rights were not violated by the nondisclosure of evidence because the defense used the same evidence to impeach the witnesses at issue during trial).

¶ 38 Likewise, Bisner has no claim that the State's failure to disclose its alleged promise not to prosecute Lyman for drug distribution violated his right to a fair trial. While the record does not reflect the precise moment at which the defense became aware of this alleged promise, it is clear that the defense knew about the possibility of the inducement well before the trial concluded— at the very least, by the end of the State's case in chief. In the hearing on his motion to strike Lyman's testimony, held just after the State examined its last witness, Bisner's attorney specifically alleged it was his "view that [Lyman's] testimony indicates a de facto deal" on the State's part not to prosecute Lyman for drug distribution. Bisner's attorney stated further, "I believe that ... Mr. Lyman was told, perhaps through counsel, that he would not be prosecuted for certain admitted drug distribution charges...." In response, counsel for the State acknowledged that he had told Lyman's attorney that the State "wouldn't be able to prosecute [Lyman] because [the State] had no evidence other than his statements that there was a crime committed." However, despite the State's acknowledgment in this regard—and despite Bisner's assertion that Lyman had received a "de facto deal" of nonprosecution in exchange for his testimony—the defense utterly failed to make use of this knowledge during trial. Following the hearing on his motion to strike Lyman's testimony, Bisner could have recalled Lyman as a witness to question him specifically about the nature of the alleged "de facto deal" guaranteeing that the State would not prosecute him for drug distribution. Bisner similarly could have sought a continuance or recess in order to further investigate the exculpatory potential of the evidence. But the defense did not capitalize on either of these possibilities. Instead,

when asked by the trial court whether it wished to call any witnesses, the defense declined, noting that it was "satisfied with the state of the evidence." Consequently, we hold that because the defense was afforded a full opportunity "to make use of the ... disclosed information," but failed to do so, the State's nondisclosure of its alleged promise not to prosecute Lyman did not violate Bisner's due process rights. *Adams,* 834 F.2d at 635; *see also Grintjes,* 237 F.3d at 880 (holding that no *Brady* violation occurred where the defendant failed to use the allegedly exculpatory information disclosed during trial); *Mullins,* 22 F.3d at 1371–72 (finding no *Brady* violation where information "was known" by the defendant "in time for him to attempt to make use of it"); *United States v. Ramirez,* 810 F.2d 1338, 1343 (5th Cir.1987) (same).

### B. Nondisclosure of the Alleged Agreements with Koontz, Pearson, and Symes

■■■ ¶ 39 Bisner also claims that the State violated his due process rights under *Brady* by failing to disclose leniency agreements it allegedly entered into with Koontz, Pearson, and Symes concerning the charges they faced for their actions in the events leading to Golub's death. However, Bisner failed to properly preserve this claim at the trial level, and thus waived his right to raise the issue on appeal. While Bisner did move for a new trial on the basis that the State had failed to disclose the inducements it allegedly offered Lyman for his testimony, Bisner never properly raised before the trial court his assertion, made now on appeal, that the State also failed to disclose cooperation agreements it allegedly entered into with Koontz, Pearson, and Symes. Indeed, the only time Bisner ever brought the issue of the alleged agreements with Koontz and Pearson before the trial court was in his December 1, 1999,

motion requesting that the court reconsider its decision denying his initial motion for a new trial. Significantly, the trial court never ruled on this motion to reconsider, as Bisner filed his notice of appeal on December 30, 1999, divesting jurisdiction from the trial court. *See Hi–Country Estates Homeowners Ass'n v. Foothills Water Co.,* 942 P.2d 305, 306 (Utah 1996) (holding that filing notice of appeal "divests the trial court of jurisdiction and transfers it to the appellate court"); *see also Cheves v. Williams,* 1999 UT 86, ¶ 45, 993 P.2d 191; *White v. State,* 795 P.2d 648, 650 (Utah 1990). In fact, we have already ruled in this case that the trial court lacks jurisdiction to consider Bisner's motion to reconsider since Bisner filed notice of appeal before the trial court could enter a final order on the issue. *See supra* ¶ 29 ("Defendant's motion to dismiss this appeal without prejudice while the trial court considers defendant's motion to reconsider ... is denied.... The trial court lacks jurisdiction to consider anything further in this case because defendant timely filed his notice of appeal on December 30, 1999."). Similarly, Bisner did not argue even once to the trial court that the State had failed to disclose a cooperation agreement with Symes.[2] Accordingly, because Bisner failed to preserve the issue below, he cannot now claim that the State violated his due process rights by failing to disclose alleged leniency agreements with Koontz, Pearson, and Symes. *See State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346 ("[C]laims not raised before the trial court may not be raised on appeal.... [This] preservation rule applies to every claim, including constitutional questions...."); *Monson v. Carver,* 928 P.2d 1017, 1022 (Utah 1996) (holding that constitutional claims not raised in the district court are deemed to be waived); *see also State v. Thomas,* 1999 UT

---

2. In fact, even Bisner's December 1, 1999, motion to reconsider addressed only the testimony of Lyman, Koontz, and Pearson. Yet two months after Bisner filed his motion to reconsider, he submitted to the trial court a document entitled "supplement to record of motion for new trial," which included a transcript of Symes's sentencing hearing that Bisner now relies on in support of his argument that Symes entered into a leniency agreement with the State. However, at no point in this "supplement" does Bisner ever assert that the alleged agreement between Symes and the State violated his due process rights. Instead, as explained above, Bisner so argues for the first time on appeal. *See supra* ¶ 39. Further, Bisner submitted this "supplement" to the trial court on February 1, 2000—more than a month after he filed his notice of appeal on December 30, 1999, and thus well after the trial court had been divested of jurisdiction to consider the matter. *See supra* ¶ 39.

2, ¶ 29, 974 P.2d 269; *State v. Lopez*, 886 P.2d 1105, 1113 (Utah 1994).

¶ 40 Moreover, even if Bisner did not waive his right to raise the issue on appeal, the State's•nondisclosure of its alleged leniency agreements with Koontz, Pearson, and Symes did not violate *Brady*. As with the inducements allegedly promised to Lyman, the State's alleged leniency agreements with Koontz, Pearson, and Symes fall within *Brady* 's purview solely for their impeachment value. *See Giglio*, 405 U.S. at 154–55, 92 S.Ct. 763. However, both Koontz and Pearson admitted at trial that they had pled guilty to reduced misdemeanor charges despite the fact that they had initially been charged with felonies, and Symes testified at Bisner's preliminary hearing that the State would inform his sentencing judge that he had testified cooperatively in Bisner's case. Specifically, Koontz acknowledged that he had been charged with "murder" but "ended up pleading to attempted rioting, class A, and a class B assault." Pearson likewise testified that he had been charged with "felony riot" but "pled guilty to ... a class B and a class A ... attempted riot and simple assault." And Symes testified that the State had agreed to "[i]nform the court of my testimony and [that] I was cooperative" following his appearance as a witness in Bisner's case. Accordingly, because the necessary information from which the credibility of their testimony could be questioned actually came out at trial and before, the State cannot be said to have withheld exculpatory information. The defense could have further exposed any potential leniency agreements with the smallest amount of "reasonable diligence" by simply asking Koontz and Pearson why their charges had been reduced, and Symes had already disclosed the nature of his agreement with the State in the presence of Bisner's attorney and while under oath. *See United States v. Campagnuolo*, 592 F.2d 852, 861 (5th Cir.1979); *see also, e.g., Grintjes*, 237 F.3d at 880; *Jarrell v. Balkcom*, 735 F.2d 1242, 1258 (11th Cir.1984). Given these cir-

cumstances, the defense reasonably should have known of the possibility of the alleged agreements, as Bisner's attorney possessed the "essential facts permitting [Bisner] to take advantage of any exculpatory evidence" related to Koontz's, Pearson's, and Symes's testimony. *Rector*, 120 F.3d at 560. Thus, no *Brady* violation could have occurred. *See United States v. Zackson*, 6 F.3d 911, 919 (2d Cir.1993) (rejecting a claim of a *Brady* violation because the defendant "was ... aware that [a witness's] cooperation may have warranted some additional investigation"); *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir.1991) ("When ... a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government."); *see also, e.g., United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir.1991); *Le-Roy*, 687 F.2d at 618.[3]

## II. CONSENT TO SEARCH

¶ 41 Bisner's second contention on appeal is that the trial court erred in denying his motion to suppress the evidence removed from his living quarters in his mother's basement, namely, the assault rifle used to kill Golub. Bisner premises this contention on the argument that the warrant employed to confiscate the assault rifle was ineffective because the information used to secure the warrant was obtained unconstitutionally. Specifically, Bisner asserts (1) that his mother did not give Officer Severson "voluntary consent to conduct [the] ... search" of her home immediately following Bisner's arrest, and (2) that the subsequent search conducted by Detective Soper also was unconstitutional since the written consent given by Bisner's mother was involuntary, as it "was obtained by exploiting the prior unlawful, warrantless search."

¶ 42 The question of whether a party has voluntarily consented to a search is a question of law, and we therefore review it

---

**3.** Bisner also urges that the State's failure to disclose its alleged cooperation agreements with Koontz, Lyman, Pearson,. and Symes violated his constitutional right to confront these witnesses and his discovery rights pursuant to Utah Rule of Criminal Procedure 16(a). However, Bisner did not lodge these arguments before the trial court.

Thus, he has waived his right to raise them on appeal. *See State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346; *State v. Thomas*, 1999 UT 2, ¶ 29, 974 P.2d 269; *Monson v. Carver*, 928 P.2d 1017, 1022 (Utah 1996); *State v. Lopez*, 886 P.2d 1105, 1113 (Utah 1994).

for correctness. *State v. Harmon,* 910 P.2d 1196, 1199 (Utah 1995); *see also Landes v. Capital City Bank,* 795 P.2d 1127, 1129 (Utah 1990). Conversely, we will reverse the trial court's factual findings only if they are clearly erroneous. *Harmon,* 910 P.2d at 1199; *see also State v. Arroyo,* 796 P.2d 684, 687 (Utah 1990). In determining whether a trial court's factual findings are clearly erroneous, we reject those findings that are not "supported by substantial, competent evidence." *Arroyo,* 796 P.2d at 687.

### A. Applicable Law

¶ 43 Warrantless searches are per se unconstitutional under the Fourth Amendment unless conducted pursuant to a recognized exception to the warrant requirement. *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *State v. Brown,* 853 P.2d 851, 855 (Utah 1992). One such exception includes searches conducted pursuant to consent. *Washington v. Chrisman,* 455 U.S. 1, 9–10, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982); *State v. Harris,* 671 P.2d 175, 179 (Utah 1983). However, for a consent search to be valid, consent must have been given voluntarily and not have been "obtained by police exploitation of … prior illegality." *State v. Thurman,* 846 P.2d 1256, 1262 (Utah 1993).

¶ 44 In support of his contention that his mother did not voluntarily consent to Officer Severson's initial search of her house, Bisner urges that consent is voluntary only if

"(1) [t]here [is] clear and positive testimony that the consent was 'unequivocal and specific' and 'freely and intelligently given'; (2) the government … prove[s] consent was given without duress or coercion, express or implied; and (3) … there [is] convincing evidence that [the party] waived [its constitutional right against unreasonable searches and seizures]."

*State v. Ham,* 910 P.2d 433, 439 (Utah Ct. App.1996) (citations omitted). This test for determining voluntariness was adopted by the Utah Court of Appeals in *State v. Marshall,* 791 P.2d 880, 887–88 (Utah Ct.App. 1990), and has been applied in myriad of that

court's cases over the past decade.[4] While this test correctly requires absence of duress or coercion for consent to be deemed voluntary, it also mandates a showing that the consenting party affirmatively waived its constitutional right against unreasonable searches and seizures. *See Ham,* 910 P.2d at 439. In fact, in adopting this test the court of appeals expressly relied on the Tenth Circuit's decision in *Villano v. United States,* 310 F.2d 680, 684 (10th Cir.1962), which also required affirmative waiver for consent to be voluntary.

¶ 45 However, eleven years after the Tenth Circuit handed down *Villano,* the United States Supreme Court flatly rejected the requirement that the prosecution establish waiver in order to demonstrate voluntariness. In *Schneckloth v. Bustamonte,* the Court held: "Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures." 412 U.S. 218, 241, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Consequently, the Court ruled that voluntariness must be determined, not from a demonstration of waiver, but from "the totality of all the circumstances." *Id.* at 227, 93 S.Ct. 2041.

¶ 46 As a result of the Supreme Court's decision in *Schneckloth,* the Tenth Circuit has since abandoned the *Villano* test. *See United States v. Price,* 925 F.2d 1268, 1271 (10th Cir.1991) ("In light of the *Schneckloth* decision, we … find … the *Villano* test's application of the presumption against waiver improper."). Likewise, this court has itself repeatedly followed the *Schneckloth* "totality of all the circumstances" analysis in lieu of any potential waiver test. *See, e.g., Harmon,* 910 P.2d at 1206; *State v. Dunn,* 850 P.2d 1201, 1217–18 (Utah 1993); *Thurman,* 846 P.2d at 1262–63; *Arroyo,* 796 P.2d at 689. Indeed, this court must follow *Schneckloth* 's interpretation of consent under the Fourth Amendment, for the United States Supreme

---

4. *See, e.g., State v. Hansen,* 2000 UT App 353, ¶¶ 18–25, 17 P.3d 1135; *Ham,* 910 P.2d at 439; *State v. Genovesi,* 871 P.2d 547, 551 (Utah Ct. App.1994); *State v. Carter,* 812 P.2d 460, 467 (Utah Ct.App.1991), *cert. denied,* 836 P.2d 1383 (Utah 1992); *State v. Grovier,* 808 P.2d 133, 136 (Utah Ct.App.1991); *State v. Sterger,* 808 P.2d 122, 127 (Utah Ct.App.1991).

Court has been vested with final authority in interpreting the federal Constitution since the inception of our republic.[5] *See* U.S. Const. art. III, § 2, cl. 1; *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

¶ 47 Accordingly, to the degree it hinges consent upon waiver—and to the extent our prior cases have not made our position perfectly clear—we today explicitly reject the court of appeals' voluntariness test as enunciated in *Marshall* and its progeny. When assessing whether consent to a warrantless search was given voluntarily, courts in Utah must follow the same analysis we have repeatedly applied since *Schneckloth*: Consent is not voluntary if it is obtained as "the product of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041; *see also, e.g., Harmon*, 910 P.2d at 1206; *State v. Whittenback*, 621 P.2d 103, 106 (Utah 1980). Factors indicating a lack of duress or coercion, which should be assessed in the "totality of all the surrounding circumstances," include,

> 1) the absence of a claim of authority to search by the officers; 2) the absence of an exhibition of force by the officers; 3) a mere request to search; 4) cooperation by the owner of the [property]; and 5) the absence of deception or trick on the part of the officer.

*Whittenback*, 621 P.2d at 106; *see also Harmon*, 910 P.2d at 1206.

### B. Consent for Officer Severson's Search

¶ 48 Applying these factors to the case at hand, we now turn to the question of whether Bisner's mother voluntarily consented to Officer Severson's search. Bisner asserts that the police coerced his mother's consent to this search by making a "show of authority" and an "exhibition of force," which in turn

transformed their petition to search her house into "more than a 'mere request' to search." Specifically, Bisner argues that the police exhibited force and showed authority by having "several uniformed officers" present during Bisner's arrest, by "physical[ly] touching" Bisner and drawing their weapons while taking him into custody, by stepping "inside the front door [of the house] before asking permission to search," and by telling Bisner's mother and sisters to stay in their kitchen while Officer Severson searched the house.

¶ 49 Despite Bisner's contention to the contrary, however, the officers' actions directed at him during his arrest are wholly irrelevant to whether the officers exhibited force toward his mother. While we do review the totality of the circumstances in assessing whether the officers used duress or coercion to obtain consent to search, that examination is limited to whether duress or coercion was exerted on the person who consented to the search, Bisner's mother, not to an entirely separate person, Bisner. *See Harmon*, 910 P.2d at 1206–08; *Thurman*, 846 P.2d at 1262–63. Moreover, Bisner does not challenge the trial court's factual findings in respect to the search, and those findings indicate that the officers did not exhibit force against Bisner's mother during her son's arrest: The officers telephoned Bisner from outside the house, requesting that he come outside and surrender himself, which he did. When Bisner exited the house, the officers had their weapons drawn, but they were pointed at Bisner, not at his mother. Indeed, Bisner's mother remained in her house throughout Bisner's arrest. And when Officer Severson and his assisting officer approached the house, their guns were holstered, where they remained throughout the officers' discussion with Bisner's mother.

---

5. In addition to his claim that the searches at issue violated his rights under the Fourth Amendment of the federal Constitution, Bisner claims that the searches also constituted violations of his rights pursuant to article I, section 14 of the Utah Constitution. However, Bisner neither proffers any explanation as to how this court's analysis should be conducted under this section nor cites even one case in support of this argument. We have repeatedly reminded that

this court " 'is not simply a depository in which the appealing party may dump the burden of argument and research.' " *State v. Bishop*, 753 P.2d 439, 450 (Utah 1988) (quoting *Williamson v. Opsahl*, 92 Ill.App.3d 1087, 48 Ill.Dec. 510, 416 N.E.2d 783, 784 (1981)); *see also MacKay v. Hardy*, 973 P.2d 941, 948 n. 9 (Utah 1998). Accordingly, we decline to address this claim separately. *State v. Kohl*, 2000 UT 35, ¶ 12 n. 3, 999 P.2d 7.

¶ 50 Similarly, there is no indication that the officers' possible stepping inside the house's front door constituted a "show of authority" as Bisner contends. In support of this argument, Bisner relies entirely on Officer Severson's statement that he "was just inside the door" when he asked Bisner's mother for her consent to search. However, Bisner takes this statement out of context in order to assert that Officer Severson entered the house intending to search before asking permission to do so. In fact, Officer Severson repeatedly characterized the discussion he had with Bisner's mother as occurring "at the door" of the house. When asked where their discussion took place, Officer Severson stated, "We were at the door." He also averred that their discussion occurred "on the front of the step" of the house and "on the porch." Indeed, when stating that their discussion may have gone on inside the house, Officer Severson testified that he "d[id]n't remember if [he] was inside" the house, but that "if [he] was inside, [he] was just inside the door"—a conclusion entirely in conformity with his other statements that the discussion occurred "at the door." Importantly, these statements amply support the trial court's factual finding that Officer Severson merely "spoke to [Bisner's mother,] who identified herself as the home owner," in an effort to tell her that "he wanted to make a cursory search of her home," not that he barged into her home without permission as Bisner implies.

¶ 51 Finally, the record does not support Bisner's argument that the "police used 'commanding language'" by "ordering [his] family to stay in the kitchen during [Officer Severson's] search." Although Officer Severson testified that he and his accompanying officer "had all of the family members stay up in the kitchen and living room area," nothing in his testimony indicates that he "commanded" or "ordered" them to do so. Rather, the only testimony Bisner cites in support of this contention is his mother's. But she simply stated that she had asked the police if she could accompany them on their search, since she was afraid their presence would "frighten [her] mother [who was] in bed." When the officers declined her request, she opened the door to her mother's bedroom and stated, "[M]om, stay calm.

Just stay in bed.... [T]he police are here." Subsequently, the police "told [her] to go back in the kitchen." Again, nothing in these statements indicates that Officer Severson "commanded" or "ordered" Bisner's family members to remain in their kitchen in an effort to coerce Bisner's mother into consenting to the search. To the contrary, Officer Severson specifically testified that Bisner's mother had told the officers to "go ahead" with their search. Moreover, the statements of both Officer Severson and Bisner's mother in regard to the officers' instructions that the family should stay in the kitchen reflect, not the officers' use of authority and force, but their desire to protect Bisner's family, as the officers "believed that three [suspects] were in custody [but that] one was still outstanding" and may have been inside the house.

¶ 52 Therefore, having examined the record in the totality of the circumstances, we conclude that the trial court properly found the police officers made no showing of force or authority, but merely requested permission to search. *See Whittenback,* 621 P.2d at 106. As a result, we hold that Bisner's mother voluntarily consented to Officer Severson's search of her home. *See Harmon,* 910 P.2d at 1208.

### C. Consent for Detective Soper's Search

¶ 53 Bisner also argues that the written consent from Bisner's mother for Detective Soper's subsequent search of the house was given involuntarily. However, Bisner does not argue that the police exercised duress or coercion in securing this consent, only that it "was obtained by exploiting the prior unlawful, warrantless search." While Bisner correctly states that consent obtained "by exploitation of ... prior police illegality" may be deemed involuntary under certain conditions, *e.g., State v. Arroyo,* 796 P.2d 684, 688 (Utah 1990), we have already determined in this case that the search by Officer Severson was entirely proper and legal. *See supra* ¶¶ 48–52. Consequently, we find Bisner's argument that the consent for Detective Soper's search was given involuntarily to be without merit, and thus, hold that the trial court did not err in denying his motion to

suppress the evidence seized from his living quarters in his mother's basement.

## III. PRIOR BAD ACTS EVIDENCE

 ¶ 54 Bisner's third contention on appeal is that the trial court erred by denying his motion to exclude evidence of the drug debt Golub owed him. We review a trial court's decision to admit evidence of prior crimes or other bad acts under an abuse of discretion standard. *State v. Widdison*, 2001 UT 60, ¶ 42, 28 P.3d 1278; *State v. Decorso*, 1999 UT 57, ¶ 18, 993 P.2d 837, *cert. denied*, 528 U.S. 1164, 120 S.Ct. 1181, 145 L.Ed.2d 1088 (2000). "However, in the proper exercise of that discretion, trial judges must 'scrupulously' examine the evidence before it is admitted." *Widdison*, 2001 UT 60 at ¶ 42, 28 P.3d 1278 (quoting *Decorso*, 1999 UT 57 at ¶ 18, 993 P.2d 837).

¶ 55 Utah Rule of Evidence 404(b) prohibits admission of "[e]vidence of other crimes, wrongs or acts" if offered "to prove the character of a person in order to show action in conformity therewith." Utah R. Evid. 404(b). Such evidence, however, is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" so long as it is also relevant and more probative than prejudicial. *Id.; see* Utah R. Evid. 402, 403. Accordingly, when deeming evidence of prior bad acts admissible, the trial court must first determine that the evidence is being offered for a proper, noncharacter purpose under rule 404(b); that it " 'tends to prove some fact that is material to the crime charged ... other than the defendant's propensity to commit crime' "; and that the evidence's probativeness in this regard is not substantially outweighed by its prejudicial impact. *State v. Nelson–Waggoner*, 2000 UT 59, ¶ 26, 6 P.3d 1120 (quoting *Decorso*, 1999 UT 57 at ¶ 22, 993 P.2d 837); *see also State v. Mead*, 2001 UT 58, ¶¶ 61–64, 27 P.3d 1115; *Decorso*, 1999 UT 57 at ¶¶ 20–23, 993 P.2d 837; Utah R. Evid. 402, 403, 404(b).

¶ 56 In this case, Bisner argues that evidence of Golub's drug debt to him "was not relevant because the shooting and confrontation [at the strip mall] were unrelated to any alleged drug deal." Therefore, Bisner contends, evidence of the drug debt was in-

admissible because it could only prove his propensity to commit crime, and was thus "unfairly prejudicial, confusing[,] and misleading." Conversely, the State advanced the position at trial that the drug debt owed by Golub provided Bisner with the motive and intent to assault and kill Golub. In support of this theory, the State questioned Lyman about his meeting with Bisner just prior to Golub's death, and the following colloquy occurred:

> Q: What else was said by Mr. Bisner?
>
> A: He mentioned that someone owed him a small amount of money, $300, something in that area, and that they were going to be meeting with this individual that night.
>
> Q: He say anything else about that?
>
> A: Yeah ..., kind of on the way out he said, "Somebody is going to die tonight" ....

In addition to Lyman's testimony, Pearson and Symes stated at trial that Bisner had informed his friends at the party that Golub owed him $350 for drugs. Bisner moved the trial court to exclude this evidence, but the court ruled that it was admissible to demonstrate "the purpose of th[e] gathering that resulted in Golub's death."

 ¶ 57 We agree with the trial court that the evidence of the drug debt between Bisner and Golub was admissible under rule 404(b). There was no question in this case about Bisner's identity or acts. The only question for the jury was whether Bisner killed Golub intentionally or, as the defense asserted, was instead acting "under an extreme emotional disturbance" caused by his drug use earlier in the evening. Evidence of the drug debt therefore was not introduced to establish Bisner's propensity to commit crime, but was admissible for the noncharacter purpose of proving his motive and intent in killing Golub. *See State v. Pearson*, 943 P.2d 1347, 1351–52 (Utah 1997).

 ¶ 58 Similarly, evidence of the drug debt was relevant as to motive and intent. Evidence is relevant under 404(b) if it " 'tends to prove some fact that is material to the crime charged.' " *Nelson–Waggoner*, 2000 UT 59 at ¶ 26, 6 P.3d 1120 (quoting *Decorso*, 1999 UT 57 at ¶ 22, 993 P.2d 837).

Here, Lyman's testimony, particularly when buttressed by the testimony of Pearson and Symes, tended to prove the material fact of Bisner's motive by presenting the jury with a reason Bisner had to kill Golub, thus making "more plausible ... the State's theory that he did so intentionally rather than" under a drug-induced emotional disturbance. *Pearson*, 943 P.2d at 1351; *see also Mead*, 2001 UT 58 at ¶ 63, 27 P.3d 1115; *Nelson–Waggoner*, 2000 UT 59 at ¶ 27, 6 P.3d 1120.

■ ¶ 59 Finally, the probative value of the drug debt evidence was not substantially outweighed by its prejudicial impact. As explained above, evidence of Golub's drug debt to Bisner was highly probative of Bisner's motivation to kill Golub intentionally— especially given that Bisner mentioned the debt repeatedly during the night of Golub's death and that he also told Lyman, "Somebody is going to die tonight." Moreover, Bisner's prior crime, selling illegal drugs, was quite minor in relation to the crimes with which he was charged, first degree felonies of murder and aggravated robbery. *See Decorso*, 1999 UT 57 at ¶ 34, 993 P.2d 837. The evidence also "did not suggest a proclivity for violence or even a significant criminal character," as it reflected only that Bisner had sold Golub $350 in drugs. *Pearson*, 943 P.2d at 1351. Indeed, these factors all suggest that the evidence was not prejudicial in proving Bisner's bad character, but was relevant to the issues of motive and intent. *Id.* at 1351–52; *see also State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988) (explaining factors that should be considered in determining whether prior bad act evidence is more probative than prejudicial). Consequently, we hold that the trial court did not abuse its discretion in denying Bisner's motion to exclude evidence of Golub's drug debt to him.

## IV. MANSLAUGHTER JURY INSTRUCTION

■ ¶ 60 Bisner next contends that the trial court erred by giving over his objection jury instruction 25. That instruction, which related to the necessity of convicting Bisner for manslaughter rather than murder if he was found to have been acting under an "extreme emotional disturbance," stated in pertinent part:

For manslaughter to apply, the "extreme emotional disturbance" must be triggered by something external to the accused, and his reaction to such external stimulus must be reasonable. The terms used must be given the meaning you would give them in common everyday use. Such disturbance, therefore, cannot have been brought about by the defendant's own peculiar mental processes or by his own knowing or intentional involvement in a crime.

Bisner asserts that this instruction "is confusing" because it implies that manslaughter excludes "all knowing and intentional homicides, even when the accused suffers from an extreme emotional disturbance."

■ ¶ 61 Despite Bisner's argument, we recently upheld a manslaughter instruction that used language identical to instruction 25. Unanimously rejecting a challenge that the instruction at issue erroneously directed "the jury that manslaughter cannot involve a knowing or intentional mental state," we held:

[Defendant]'s argument confuses knowledge and intent in causing the death of the victim with knowing or intentional involvement in a crime which in turn brings about an extreme emotional disturbance. The instruction merely explains that the manslaughter statute excludes defendant's *intentional involvement in a crime* from the class of circumstances that can give rise to an extreme emotional disturbance which mitigates murder to manslaughter.

*State v. Piansiaksone*, 954 P.2d 861, 872 (Utah 1998) (emphasis in original). Given our holding in *Piansiaksone*, we reiterate today what we have repeatedly held in the past: that "[t]hose asking us to overturn prior precedent have a substantial burden of persuasion." *State v. Menzies*, 889 P.2d 393, 398 (Utah 1994). Indeed, "[t]his burden is mandated by the doctrine of stare decisis," and to convince us that a previous rule should be overturned, an appealing party must clearly demonstrate " 'that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.' " *Id.* at 398, 399 (quoting John Hanna, *The Role of Precedent in Judicial*

*Decision,* 2 Vill. L. Rev. 367, 367 (1957)). In this case, Bisner's argument that the manslaughter instruction "is confusing," which he bolsters with absolutely no case law, statutory analysis, or other legal authority, "does not even approach the high bar required to override stare decisis." *City of Hildale v. Cooke,* 2001 UT 56, ¶ 36, 28 P.3d 697. Accordingly, we rule that the trial court did not err in giving the instruction over Bisner's objection.

## V. MERGER

 ¶ 62 Finally, Bisner challenges the trial court's refusal to merge his convictions for aggravated robbery and murder. Specifically, Bisner argues that section 76–1–402(3) of the Utah Code, which states that a "defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense," Utah Code Ann. § 76–1–402(3) (1999), mandates that we "dismiss, or in the alternative[,] merge [his] aggravated robbery charge with the [felony] murder charge." Bisner's argument, however, must fail for at least two reasons.

¶ 63 First, like Bisner's challenge to the manslaughter jury instruction given in this case, we have already decided the issue of whether the legislature intended the crime of felony murder to merge with the underlying felony of aggravated robbery. In *State v. McCovey,* we held:

> [T]he Utah State Legislature did not intend the multiple crimes of felony murder to be punished as a single crime, but rather, that the homicide be enhanced to second degree felony murder in addition to the underlying felony. To conclude otherwise would be to defeat the deterrent purpose of the felony murder statute and result in unjust consequences. A true lesser included relationship does not exist in the felony murder statute. . . .

803 P.2d 1234, 1239 (Utah 1990). Asserting that *McCovey* does not apply to the case now before us, Bisner argues that *McCovey* "does not preclude [merger of aggravated robbery and felony murder] under the appropriate factual circumstances" because our holding in that case was "based largely on the existence of two separate victims." However, while we did note in *McCovey* that the existence of

two different victims was one factor that distinguished the case factually from prior merger decisions, we did not base our interpretation of the felony murder statute on that distinction. Rather, we explicitly premised our holding on the legislature's intent in enacting the statute. *Id.; see also id.* at 1238 (noting that the modern felony murder statute differs in aim and purpose from the common law doctrine). Likewise, Bisner's reliance on our earlier decision in *State v. Shaffer,* 725 P.2d 1301 (Utah 1986), is misplaced. *Shaffer* dealt with the merger of aggravated robbery and aggravated murder under Utah Code section 76–5–202 and is thus inapposite to Bisner's conviction here for murder under Utah Code section 76–5–203. *Id.* at 1313–14.

¶ 64 Moreover, unlike *McCovey,* it is not undisputed in this case that Bisner was convicted for felony murder. *See* 803 P.2d at 1234 ("The fact that McCovey was convicted for second degree felony murder . . . is undisputed."). The State charged Bisner with murder under three alternate theories—that he killed Golub intentionally or knowingly, that he did so with the intent to cause serious bodily injury to another, or that he did so while in the commission of aggravated robbery. Importantly, however, the State introduced overwhelming evidence at trial that Bisner killed Golub intentionally or knowingly: Bisner declared just hours prior to Golub's death that "[s]omebody is going to die tonight." When Bisner and his friends met Golub at the strip mall, Bisner assaulted Golub after Koontz and Symes had knocked him to the ground. Then, even though Bisner's friends withdrew and urged Bisner to join them, he remained. As this occurred, Golub, who had been disarmed, fled to his truck and began speeding away. Despite this fact, Bisner shot at Golub three times. When he realized his shots missed, Bisner fired three more rounds, killing Golub. This evidence was sufficient for the jury to find that Bisner killed Golub intentionally or knowingly.

¶ 65 As a result, we hold that, in accordance with our decision in *McCovey,* the trial court did not err by denying Bisner's motion to merge his convictions for aggravated robbery and murder. 803 P.2d at 1239.

## CONCLUSION

¶ 66 The trial court did not abuse its discretion by denying Bisner's motion for a new trial on due process grounds, nor did it err in admitting into evidence the assault rifle seized from Bisner's closet. The trial court also acted properly in denying Bisner's motion to exclude evidence of the drug debt Golub owed him, in instructing the jury concerning manslaughter, and in refusing to merge Bisner's charges for aggravated robbery and murder. Accordingly, we affirm Bisner's convictions as entered below.

¶ 67 Chief Justice HOWE, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Associate Chief Justice RUSSON's opinion.